# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | No. 26-01430 |
| Primrose Candy Co., | ) | Chapter 11 |
| | ) | Hon. Jacqueline P. Cox |
| *Debtor/Debtor-in-Possession.* | ) | |
| | ) | |

## DECLARATION OF JEFF PUCH, PRESIDENT OF PRIMROSE CANDY CO.

JEFF PUCH, President of PRIMROSE CANDY CO. (the "Debtor"), hereby states under oath, that if called as a witness, I would testify as follows:

**Introduction**

1) I am the President and a director of the Debtor. Michelle Puch, an officer and director of the Debtor, and I have each been designated as a "Responsible Party" by the Debtor's board of directors and are authorized and directed to take all actions necessary on behalf of the Debtor in the underlying Chapter 11 case filed by the Debtor.

2) I have familiarity with and knowledge of the Debtor's assets, liabilities, business operations and financial affairs.

3) On January 27, 2026, (the "Petition Date") the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

4) In conjunction with the filing of this Chapter 11 Case, among other things, the Debtor has filed a Motion for Authority to Obtain Post-Petition Secured Financing, to Use Cash Collateral and For Related Relief (the "Secured Financing/Cash Collateral Motion"). I offer this Declaration in support of the Secured Financing/Cash Collateral Motion.

**The Secured Financing/Cash Collateral Motion**

5) The Secured Financing/Cash Collateral Motion is to be heard by the Bankruptcy Court on February 3, 2026.

6) The Debtor has attached cash flow projections relating to the Debtor's revenue and expenses during the initial weeks of this Chapter 11 case (the "Budget"). All projected disbursements are essential to maintaining the Debtor's business as a going concern. The Budget was prepared by Patrick O'Malley of Development Specialists, Inc. ("DSI") with the assistance of Debtor's management, Michelle Puch and me. DSI is the Debtor's financial advisor.

7) By the Secured Financing/Cash Collateral Motion, the Debtor requests that the Bankruptcy Court authorize it to, among other things:

A) Obtain post-petition secured financing from an existing Line of Credit from Pathward, N.A. ("Pathward") as set forth in the Budget attached to the Secured Financing/Cash Collateral Motion; and

B) Use cash and cash equivalents that serve as collateral for Pathward.

**Relevant Background**

8) The Debtor is engaged in the business of manufacturing special candy and related products, inclusive of organic, sugar-free, supplement and OTC items, in addition to traditional confectionary products.

9) The Debtor has been in business since 1928 and primarily operates from the premises at 4111 West Parker Avenue, Chicago, Illinois. The Debtor employs approximately 90 people, many of whom are outside contract labor employees provided to the Debtor pursuant to an Agreement for Temporary Personnel with Labor Solutions, LLC ("Labor Solutions").[1]

[1] Labor Solutions is a creditor with a claim in the approximate amount of $7,500,000.00 as of the Petition Date. While Labor Solutions has no lien on the Debtor's assets, Labor Solutions is asserting mortgage liens against certain non-Debtor real estate that secures the indebtedness due from the Debtor.

10) Labor Solutions is a critical vendor of the Debtor. Prior to the Petition Date, Labor Solutions filed litigation against the Debtor for breach of contract and against the non-Debtor entities to foreclose on its mortgage liens ("LS Litigation"). Despite the pendency of the LS Litigation, Labor Solutions has continued to provide contract employees to the Debtor pursuant to the Agreement for Temporary Personnel. Labor Solutions has further agreed to provide such contract employees to the Debtor during this Chapter 11 Case.

11) The Debtor had annual gross revenues of $7,800,000.00 in 2025 and $11,800,000.00 in 2024.

12) On or about February 21, 2024 and thereafter, the Debtor entered into a secured loan transaction with Pathward,[2] wherein Pathward and the Debtor entered into a Loan and Security Agreement, Promissory Note (Line of Credit) and related loan documents and amendments evidencing a line of credit to the Debtor in the maximum amount of $7,500,000.00 (the "Pathward Line of Credit"). Copies of the Promissory Note (Line of Credit) and the Amended and Restated Promissory Note (Line of Credit) are attached to the Secured Financing/Cash Collateral Motion as **Exhibit B**. Copies of the Loan and Security Agreement and various Amendments thereto are attached to the Secured Financing/Cash Collateral Motion as **Exhibit C**.

13) Pathward is asserting first position liens on all of the Debtor's assets to secure a claim in the amount of approximately $5,200,000.00 as of the Petition Date. Pathward, by its predecessor Crestmark, filed a UCC-1 financing statement on February 24, 2021, providing for and perfecting liens on "All assets of the Debtor whether now owned or hereafter acquired and wherever located." A copy of Pathward's recorded UCC-1 statement is attached to the Secured Financing/Cash Collateral Motion as **Exhibit D**.

[2] The Debtor actually entered into this secured loan transaction with Crestmark, a division of MetaBank, N.A. Thereafter, on information and belief, Crestmark was acquired by Pathward.

14) The Debtor utilizes the Pathward Line of Credit to pay its operating expenses and creditors. It is likely that the Debtor's cash flow will be insufficient to meet its operating expenses and creditor obligations in a timely manner during this Chapter 11 Case thereby necessitating the continued use of the Pathward Line of Credit. Under the Pathward Line of Credit, the Debtor makes draws based upon availability established under borrowing base certificates provided to Pathward. Advances are made at 85% of eligible accounts receivable and 50% of eligible finished goods inventory. The Debtor also has marketable securities with an approximate value of $3,800,000.00 that also serve as collateral to Pathward. The advance rate on these marketable securities is 80%.[3] Attached as **Exhibit E** to the Secured Financing/Cash Collateral Motion is a copy of a prior borrowing base certificate provided by the Debtor to Pathward which indicates the status of the Pathward Line of Credit and the values for certain of Pathward's collateral.

15) Pathward is willing to enter into post-petition financing with the Debtor which, among other things, includes the terms and conditions of the pre-petition Pathward Line of Credit. In conjunction with this post-petition financing, Pathward has also agreed to release up to $500,000.00 of marketable securities that are collateral to Pathward to cover expenditures set forth in the Budget.

**<u>Need For Secured Financing and Use of Cash Collateral</u>**

16) Pathward assert liens and security interests against the Debtor's assets to secure its respective underlying indebtedness due from the Debtor under Pathward's collective loan documents.

---

[3] Pathward also has liens on all other assets of the Debtor but none of those other assets support any borrowing on the Pathward Line of Credit. The Debtor estimates that its equipment (which is collateral to Pathward) has a conservative estimated value in excess of $1,500,000.00.

17) The secured financing and use of cash collateral issues in this Chapter 11 Case relate to the Debtor's use of its cash, cash equivalents, deposits, marketable securities and accounts receivable. Other than Pathward, the Debtor has no other creditor with a secured interest in cash collateral.

18) In order for the Debtor to continue to operate its business in the ordinary course without disruption, it is essential that the Debtor be authorized to obtain secured financing and use cash collateral for, among other things, the following purposes:

A) Insurance;

B) Utilities;

C) Payroll and payroll related items;

D) Payments to post-petition vendors;

E) Real estate taxes, insurance and property maintenance for properties utilized by the Debtor in the operation of its business; and

F) Other miscellaneous items needed in the ordinary course of business.

19) Since the Debtor's cash flow is insufficient in any given week, the Debtor proposes to draw on the Pathward Line of Credit to cover such insufficiencies in the same manner as occurred prior to the Petition Date pursuant to the terms and conditions of the pre-petition loan documents with Pathward. Further Budgets will be provided by the Debtor as needed and as this Chapter 11 Case progresses.

20) Use of the proposed secured financing from the Pathward Line of Credit to pay the actual, necessary and ordinary expenses to maintain the Debtor's business will preserve the value of the Debtor's assets and business and thereby insure that the interests of creditors that have or may assert an interest in both cash collateral and the Debtor's other assets are adequately protected

within the meaning of Sections 361, 362, 363 and 364 of the Bankruptcy Code. Such borrowings will also preserve employment for approximately 90 employees.

21) With respect to the proposed secured financing from Pathward, due to the immediacy of its needs, the Debtor is unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code or pursuant to Sections 364(a), (b) or (c)(1) of the Bankruptcy Code. Moreover, the Debtor believes that a continuation of the Pathward Line of Credit is the most expedient, efficient and economical financing available to the Debtor.

22) The Debtor proposes, subject to the approval of this Court, to obtain secured financing pursuant to the Pathward Line of Credit, as previously done prior to the Petition Date. The Debtor's proposal will permit the Debtor to sustain its business and reorganize its financial affairs through the implementation of a successful plan of reorganization. Furthermore, the Debtor's proposal will adequately protect the secured interests of Pathward.

23) Unless the Debtor is authorized to obtain secured financing from the Pathward Line of Credit and use cash collateral, as set forth in this Motion, the Debtor will be unable to continue to pay necessary business expenses, operate the business and manage its property, thereby eliminating any reasonable prospect for a successful reorganization. Without the proposed secured financing and the use collateral, the Debtor, its creditors and this estate will experience irreparable harm.

24) The Debtor proposes to obtain secured financing, use cash collateral and provide adequate protection to Pathward upon the following terms and conditions on an interim basis pending a final hearing on the Secured Financing/Cash Collateral Motion:

A) The Debtor will permit Pathward to inspect, upon reasonable notice, within reasonable hours, the Debtor's books and records;

B) The Debtor shall maintain and pay premiums for insurance to cover all of its assets from fire, theft and water damage;

C) The Debtor shall, upon reasonable request, make available to Pathward evidence of that which constitutes its collateral or proceeds;

D) The Debtor will properly maintain its assets in good repair and properly manage the business;

E) Pathward shall be granted valid, perfected, enforceable security interests in and to Debtor's post-petition assets, including all proceeds and products which are now or hereafter become property of this estate to the extent and priority of its alleged pre-petition liens, to the extent of the validity thereof;

F) The Debtor is authorized to draw on the Pathward Line of Credit when necessary pursuant to the terms and conditions of the existing pre-petition Pathward loan documents; and

G) The Debtor shall make contract interest payments to Pathward as required by the pre-petition Pathward loan documents.

25) Further Budgets, when necessary, will be submitted to this Court. The Debtor will make the expenditures set forth in the Budget to the Secured Financing/Cash Collateral Motion plus no more than 10% of the total proposed expense payments, unless otherwise agreed by Pathward or upon further Order of this Court. Furthermore, any expenses that are budgeted for payment in one month but are not paid in such month shall be carried over for payment in subsequent months.

26) The Debtor believes that it is in the best interests of the Debtor, its creditors and this estate to authorize it to obtain post-petition financing and use its cash and cash equivalents as set forth in the Secured Financing/Cash Collateral Motion to pay its business expenses as set forth in the Budget thereby avoiding immediate and irreparable harm and loss to the Debtor, creditors and this estate.

27) I believe that the statements in this Declaration are true, accurate and complete to the best of my knowledge, information and belief. I make this Declaration under penalty of perjury.

Jeff Puch,
Debtor's President



20559\00004\4908-6463-9114.v1

# EXHIBIT B

**PROMISSORY NOTE**
**(LINE OF CREDIT)**

**Principal Amount up to $6,000,000.00**

**Troy, Michigan**

**Dated: February 24, 2021**

This Promissory Note ("Note") is made by the Borrower who has signed this Note. The Borrower promises to pay to the order of **CRESTMARK, A DIVISION OF METABANK, NATIONAL ASSOCIATION** ("Crestmark"), ON DEMAND, at its offices located at 5480 Corporate Drive, Suite 350, Troy, Michigan 48098 or at such other place as Crestmark or the person that then holds this Note designates in writing, the principal amount set forth above or such lesser or greater amount as may then be due under the Agreement (as defined below), plus interest, fees and expenses as hereinafter provided. All payments that are made must be made in lawful money of the United States of America in immediately available funds. Borrower does not have any right to offset, deduction, or counterclaim from the amount due.

This Note is referred to in and was delivered pursuant to the Loan and Security Agreement ("Agreement") of even date between Borrower and Crestmark under which Advances, repayment and further Advances may be made from time to time, pursuant to the provisions of the Agreement. Reference is made to the Agreement for additional terms relating to this Note and the security given for this Note. Any capitalized terms used in this Note, if not defined in this Note, will have the meanings assigned to such terms in the Agreement.

Provided there is no uncured Default at the time Crestmark demands payment and no uncured Default occurs after such demand, Borrower shall have one hundred-twenty (120) days from the date of such demand to pay the Indebtedness in full from the proceeds of replacement financing or otherwise pay the Indebtedness in full, and during such time Crestmark may continue to make discretionary Advances to the Borrower under the terms of the Agreement. Notwithstanding anything contained herein to the contrary, Crestmark may pursue all remedies under the Loan Documents and applicable law if there is an uncured event of Default before or after demand for payment.

The outstanding principal balance of this Note will bear interest based upon a year of 360 days with interest being charged for each day the principal amount is outstanding including the date of actual payment. The interest rate will be a rate which is equal to five percentage points (5.0%) in excess of that rate shown in the Wall Street Journal as the prime rate (the "Effective Rate"). Interest on this Note will change with each change in the prime rate so published. If at any time Crestmark either abandons the use of the Wall Street Journal prime rate or the Wall Street Journal prime rate is no longer published, then Crestmark will establish a similar replacement rate in its sole discretion. Notwithstanding the foregoing, at no time will the Effective Rate be less than eight and one-quarter of one percent (8.25%) per annum.

The Effective Rate may be adjusted as provided for in the Agreement as determined by Crestmark in its sole discretion. If there is an adjustment, Borrower shall be required to execute and amended and restated Note.

Borrower must pay interest on the principal amount which is outstanding each month in arrears commencing on the first day of the month following the funding of the transaction, and continuing on the first day of each month thereafter until the Obligations are fully paid. If the Agreement so provides, interest will also be payable at the same rate on all other sums constituting Obligations. If any payment is due on a day which Crestmark is not open for business, then payments will be made on the next business day. Payments will be applied in the manner provided in the Agreement. If Borrower at any time pays less than the amount then due, Crestmark may accept such payment, but the failure to pay the entire amount due is a

Default. The (i) failure of Borrower to comply with the provisions of the Agreement or (ii) failure to pay the Obligations following demand will permit Crestmark to charge the Extra Rate. The "Extra Rate" shall mean the Effective Rate plus four percent (4%) per annum.

Should Borrower make any payment by mail, the payment must be actually received by Crestmark before the payment is credited but payment is still subject to the Clearance Day as defined in the Schedule to the Agreement. Borrower assumes all risk resulting from non-delivery or delay, in delivery of any payment no matter how the payment is delivered.

If Borrower elects to prepay this Note and/or terminate the Agreement, Borrower may do so, but only upon payment of all the Obligations, including the Exit Fee set forth in the Schedule.

It is the intent of the parties that the rate of interest and other charges to Borrower under this Note shall be lawful; therefore, if for any reason the interest or other charges payable hereunder are found by a court of competent jurisdiction, in a final determination, to exceed the limit Crestmark may lawfully charge Borrower, then the obligation to pay interest or other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be credited to the outstanding principal balance of this Note, or if no such amount is outstanding, refunded to Borrower.

Borrower waives any obligation of Crestmark to present this Note for payment or to give any notice of nonpayment or notice of protest and any other notices of any kind. The liability of the Borrower is absolute and unconditional, without regard to the liability of any other party.

**PRIMROSE CANDY CO.,**
an Illinois corporation

By: ______________________
Name: Jeffrey Puch
Its: President

## AMENDED AND RESTATED PROMISSORY NOTE
## (LINE OF CREDIT)

**Principal Amount up to $7,500,000.00** **Troy, Michigan**

**Original Note Dated: February 24, 2021**
**Amended and Restated Note Date: ~~October~~ 8, 2021**
November

This Amended and Restated Promissory Note (Line of Credit)("Note") is made by the Borrower who has signed this Note. The Borrower promises to pay to the order of **CRESTMARK, A DIVISION OF METABANK, NATIONAL ASSOCIATION** ("Crestmark"), ON DEMAND, at its offices located at 5480 Corporate Drive, Suite 350, Troy, Michigan 48098 or at such other place as Crestmark or the person that then holds this Note designates in writing, the principal amount set forth above or such lesser or greater amount as may then be due under the Agreement (as defined below), plus interest, fees and expenses as hereinafter provided. All payments that are made must be made in lawful money of the United States of America in immediately available funds. Borrower does not have any right to offset, deduction, or counterclaim from the amount due.

This Note is referred to in and was delivered pursuant to the Loan and Security Agreement dated as of February 24, 2021, as amended by the Amendment to Schedule to Loan and Security Agreement dated of even date herewith ("Agreement"), between Borrower and Crestmark under which Advances, repayment and further Advances may be made from time to time, pursuant to the provisions of the Agreement. Reference is made to the Agreement for additional terms relating to this Note and the security given for this Note. Any capitalized terms used in this Note, if not defined in this Note, will have the meanings assigned to such terms in the Agreement.

Provided there is no uncured Default at the time Crestmark demands payment and no uncured Default occurs after such demand, Borrower shall have one hundred and twenty (120) days from the date of such demand to pay the Indebtedness in full from the proceeds of replacement financing or otherwise pay the Indebtedness in full, and during such time Crestmark may continue to make discretionary Advances to the Borrower under the terms of the Agreement. Notwithstanding anything contained herein to the contrary, Crestmark may pursue all remedies under the Loan Documents and applicable law if there is an uncured event of Default before or after demand for payment.

The outstanding principal balance of this Note will bear interest based upon a year of 360 days with interest being charged for each day the principal amount is outstanding including the date of actual payment. The interest rate will be a rate which is equal to five percentage points (5.0%) in excess of that rate shown in the Wall Street Journal as the prime rate (the "Effective Rate"). Interest on this Note will change with each change in the prime rate so published. If at any time Crestmark either abandons the use of the Wall Street Journal prime rate or the Wall Street Journal prime rate is no longer published, then Crestmark will establish a similar replacement rate in its sole discretion. Notwithstanding the foregoing, at no time will the Effective Rate be less than eight and one-quarter of one percent (8.25%) per annum.

The Effective Rate may be adjusted as provided for in the Agreement as determined by Crestmark in its sole discretion. If there is an adjustment, Borrower shall be required to execute and amended and restated Note.

Borrower must pay interest on the principal amount which is outstanding each month in arrears commencing on the first day of the month following the funding of the transaction, and continuing on the first day of each month thereafter until the Obligations are fully paid. If the Agreement so provides, interest will also be payable at the same rate on all other sums constituting Obligations. If any payment is due on

a day which Crestmark is not open for business, then payments will be made on the next business day. Payments will be applied in the manner provided in the Agreement. If Borrower at any time pays less than the amount then due, Crestmark may accept such payment, but the failure to pay the entire amount due is a Default. The (i) failure of Borrower to comply with the provisions of the Agreement or (ii) failure to pay the Obligations following demand will permit Crestmark to charge the Extra Rate. The "Extra Rate" shall mean the Effective Rate plus four percent (4%) per annum.

Should Borrower make any payment by mail, the payment must be actually received by Crestmark before the payment is credited but payment is still subject to the Clearance Day as defined in the Schedule to the Agreement. Borrower assumes all risk resulting from non-delivery or delay, in delivery of any payment no matter how the payment is delivered.

If Borrower elects to prepay this Note and/or terminate the Agreement, Borrower may do so, but only upon payment of all the Obligations, including the Exit Fee set forth in the Schedule.

It is the intent of the parties that the rate of interest and other charges to Borrower under this Note shall be lawful; therefore, if for any reason the interest or other charges payable hereunder are found by a court of competent jurisdiction, in a final determination, to exceed the limit Crestmark may lawfully charge Borrower, then the obligation to pay interest or other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be credited to the outstanding principal balance of this Note, or if no such amount is outstanding, refunded to Borrower.

Borrower waives any obligation of Crestmark to present this Note for payment or to give any notice of nonpayment or notice of protest and any other notices of any kind. The liability of the Borrower is absolute and unconditional, without regard to the liability of any other party.

This Note amends and restates in its entirety that certain Promissory Note (Line of Credit) dated February 24, 2021 from Borrower to Crestmark in the stated principal amount of $6,000,000.00. This Note does not constitute a novation or extinguishment of the existing indebtedness evidenced by said promissory note and said indebtedness is still outstanding.

**PRIMROSE CANDY CO.,**
an Illinois corporation

By: [signature]
Name: Jeffrey Puch
Its: President

**LOAN AND SECURITY AGREEMENT**
("Agreement")

This Agreement dated February 24, 2021, is an agreement between Crestmark, a division of MetaBank, a federal savings bank ("Crestmark"), and Primrose Candy Co., an Illinois corporation ("Borrower"). In this Agreement, Crestmark and Borrower are collectively the "Parties". Any person who guarantees the obligations of Borrower (each a "Guarantor") is required to sign this Agreement. The Parties have the addresses shown on the schedule ("Schedule") which is attached to this Agreement. These are the addresses of the Parties for all purposes (including the addresses for written notices relating to this Agreement) and may be changed by one party giving notice to the other party in writing of the new address.

1. **PURPOSE.** The purpose of this Agreement, including the Schedule, is to set forth the terms and conditions of Advances (as defined in Section 2A) made from time to time by Crestmark to Borrower (collectively, the "Loan") and the obligations of Borrower. The Schedule is an integral part of this Agreement. Any and all promissory notes now or hereafter signed by Borrower pursuant to this Agreement, including the note for a line of credit and any term loans (individually and collectively referred to as the "Note"), any guaranty(s), and any other documents now or hereafter signed by any of the Parties in connection with this Agreement, the Loan or any document issued by Crestmark or the bank holding the lockbox ("Lockbox Bank"), including subordination agreements or intercreditor agreements, are also all part of the agreement between the Parties and, together with this Agreement, are referred to collectively as the "Loan Documents".

2. **LOAN; LOAN ADVANCES.**

A. Any disbursement of money or advance of credit by Crestmark, including but not limited to amounts advanced for the payment of interest, fees, expenses and amounts necessary to protect, maintain and preserve Crestmark's Collateral under the Loan Documents ("Protective Disbursements"), is referred to collectively as an "Advance". Whether Crestmark makes an Advance is in Crestmark's sole discretion. If an Advance is made, it will be made in accordance with the advance formula set forth in the Schedule ("Advance Formula"); but not at any time to exceed the maximum amount set forth on the Schedule ("Maximum Amount"), provided that Crestmark may choose to make Protective Disbursements in excess of the Maximum Amount or Advance Formula in its sole discretion. Each time Crestmark makes an Advance, including a Protective Disbursement, the Advance will be debited against an account in Borrower's name on Crestmark's books ("Loan Account"), and each payment will be credited against the Loan Account in the manner described in this Agreement.

The total amount Borrower owes to Crestmark will be the aggregate of the Advances made by Crestmark, the expenses and fees set forth in the Schedule and any and all costs incurred by Crestmark (including reasonable attorney's fees), and interest at the rate set forth in the Note on all Advances (together with all other obligations of Borrower under the Loan Documents, the "Obligations" and/or "Indebtedness"). If Borrower achieves a Debt Service Coverage Ratio of greater than 1.00 tested on a trailing six months basis not sooner than six months after the date of the Agreement and is not in Default at such time, the Effective Rate under the Note may be reduced by one percent (1%) per annum, and the Note may be reduced by an additional one half of one percent (0.5%) per annum twelve months after the date of this Agreement and eighteen months after the date of this Agreement if Borrower achieves a Debt Service Coverage Ratio of greater than 1.00 tested on a trailing twelve months basis and is not in Default at such times. "Debt Service Coverage Ratio" means as of the date of determination, the ratio determined by a fraction, the numerator of which is Borrower's net income, plus depreciation, plus amortization expense, plus non-cash rent expense, less capital expenditures not financed by term debt, less extraordinary

income, and the denominator of which is required principal and interest for all loans and capital leases.

B. Borrower must repay all Advances with respect to the Loan with interest, which is due monthly as specified in the Note, along with all other fees and expenses of Crestmark set forth herein or in the Schedule. Crestmark may in its sole discretion satisfy any Obligations due Crestmark by (i) directly applying any funds in the Lockbox Account, as defined in paragraph 5 below, to the Obligations, (ii) directly applying funds from any reserve to the Obligations, (iii) collecting the Obligations directly from Borrower, (iv) exercising its rights as a secured creditor upon any Collateral, or (e) by any other means lawfully available. Borrower understands that all the Obligations are repayable at any time in full or in part upon demand by Crestmark. Crestmark may make demand for partial payments and such demand will not preclude Crestmark from demanding payment in full at any time.

C. Borrower must comply with its representations, promises, covenants and reporting requirements set forth in this Agreement, in the Schedule and in the other Loan Documents. Borrower's failure to do any of the foregoing and/or Guarantor's failure to comply with the terms of its Guaranty are both a default under this Agreement ("Default"). The demand nature of the Obligations is not modified by reference to a Default in this Agreement or the other Loan Documents and any reference to a Default is for the purpose of permitting Crestmark to exercise it remedies for Default, including charging interest at the Extra Rate provided in the Note.

D. The aggregate amount of all Advances, plus the expenses and fees set forth in the Schedule, any and all costs incurred by Crestmark (including reasonable attorney's fees), and interest at the rate set forth in the Note on all amounts advanced (the "Loan Amount"), may not, at any time, exceed the "Maximum Amount" or the Advance Formula, and Borrower understands that if at any time it should owe more to Crestmark than the lesser of the Maximum Amount or the Advance Formula it must repay that excess amount immediately, whether or not demand to repay the whole of the Obligations has been made. Protective Disbursements must be immediately repaid whether or not the lesser of the Maximum Amount or the Advance Formula has been exceeded.

3. **RESERVES**. If Crestmark believes in its sole discretion that the prospect for repayment of the Obligations is impaired or that its Collateral margin is insufficient, Crestmark may establish cash reserves and credit balances to protect its interests and the repayment of the Obligations. The reserve may be established by reducing the Advance Formula to achieve the target reserve level, withholding monies due Borrower from any payments Crestmark receives, from a cash payment from Borrower or any other method Crestmark chooses. Any money in a reserve account, whether or not it is a cash reserve, need not be segregated from Crestmark's operating funds, and will not earn interest for Borrower, and Crestmark may apply the funds in the reserve account to reduce the Obligations at any time Crestmark elects.

4. **FEES AND EXPENSES**. In connection with the Loan there are several types of fees that may be charged and Borrower may be required to maintain a minimum Loan balance. Such fees and requirements are set forth in the Schedule. In addition, all expenses of every kind incurred by Crestmark in connection with the Loan, any Advance, collection of the Obligations, inspection, and examination are to be paid by Borrower.

5. **LOCKBOX**. Borrower must immediately notify all persons who are obligated on accounts ("Account Debtors") and any other person or party that is liable to Borrower (collectively a "Debtor") to remit all payments due Borrower to the lockbox address or pursuant to the wire transfer or ACH instructions set forth in the Schedule (the "Lockbox Account"). The remit to address on all documents related to the accounts, including invoices, purchase orders, or contracts ("Documents") must be the Lockbox Account.

At Crestmark's request, all Documents must be marked by Borrower to show assignment to Crestmark, and Borrower must notify each Account Debtor by mail that the Account has been assigned to Crestmark and that all payments on the Account, whether made by mail or electronically or otherwise must be made payable to Borrower or Crestmark, at Crestmark's sole discretion, to the Lockbox Account or other address provided by Crestmark in writing. The language used in such notices shall be approved by Crestmark in writing. Crestmark may at any time and from time to time, and at its sole discretion, notify any Debtor or third party payee to make payments payable directly to Crestmark or to notify Debtor of the assignment to Crestmark. All expenses for notification of each Account Debtor will be paid by Borrower.

If notwithstanding the notice to Debtors, Borrower receives any funds from a Debtor, including any cash, checks, drafts or wire transfers from the collection, enforcement, sale or other disposition of the Collateral (defined below), whether derived in the ordinary course of business or not, or if Borrower receives any proceeds of insurance, tax refunds or any and all other funds of any kind, Borrower shall hold such funds in trust for Crestmark, shall not mix such funds received with any other funds, and shall immediately deposit such funds in the Lockbox Account in the form received. That means if the funds are received by mail, the Debtor checks will be sent to the Lockbox Account uncashed, and if the funds are received electronically, the funds will be transferred immediately to the Lockbox Account electronically. Crestmark will have sole possession and control over the Lockbox Account. The Lockbox Bank will process all deposits and Borrower has no right to the Lockbox Account, it belongs to Crestmark. Crestmark is the owner of all deposits in the Lockbox Account, and has no duty as to collection or protection of funds as long as it is not grossly negligent or commits actual fraud. All expenses plus any applicable administration and servicing fees of the Lockbox Account will be paid by Borrower.

6. **LOAN ACCOUNT.** All of the Obligations which are owed by Borrower will be shown in the Loan Account and Borrower will receive a monthly statement either by mail, electronically or via access to the Crestmark online system at Crestmark's sole discretion. The statement is binding on Borrower unless Borrower provides a written objection to Crestmark that is actually received by Crestmark within fifteen (15) business days of the time the statement is provided or made available to Borrower. Absent (a) timely objection on the part of Borrower under this Section or (b) manifest error, the calculations and amounts of outstanding Obligations set forth in the monthly statement shall be presumptively correct.

7. **PAYMENTS.** Should a check or other credit instrument not be collected after Borrower has been given credit for such payment, then the credit will be reversed and a fee charged at Crestmark's then standard rate. Crestmark, at its sole discretion, may establish reserves as set forth above or not apply a payment that it reasonably believes may be returned unpaid for any reason or disgorged due to a preference claim or garnishment, and in such event the Maintenance Fee (as defined in the Schedule) will still be payable. In the event that any payment received by Crestmark is sought to be recovered by or on behalf of the payer (including a trustee in bankruptcy or assignee for the benefit of creditors), then Borrower agrees to immediately reimburse Crestmark on demand for any amount so recovered and all of Crestmark's expenses in connection with any such proceeding, including reasonable attorney's fees. This provision shall survive termination of this Agreement. Any payments received by Crestmark shall be applied to the Obligations in whatever order Crestmark determines in its reasonable discretion.

8. **SECURITY INTEREST.**

A. Borrower grants to Crestmark a security interest in all of its assets, now existing or hereafter arising, wherever located including all Accounts, Goods, Inventory, Equipment, Chattel Paper, Instruments, Investment Property including but not limited to marketable securities covered by a control agreement in favor of Crestmark, specifically identified Commercial Tort Claims, Documents, Deposit Accounts, Letter of Credit Rights, General Intangibles, Contract Rights, customer lists, furniture and fixtures, books and records and supporting obligations for any

of the foregoing, and all Proceeds of the foregoing (the "Collateral"), to secure repayment of the Obligations ("Security Interest"). The Collateral also includes all monies on deposit with Crestmark, or on deposit in the Lockbox Account. All capitalized terms used in this Section 8A, which are not otherwise defined shall have the meanings assigned to them in the Uniform Commercial Code as adopted in the State of Michigan (the "UCC"). Without limiting the forgoing, "Accounts" will also mean and include any and all other forms of obligations now owed or hereafter arising or acquired by the Borrower evidencing any obligation for payment for goods of any kind, nature, or description sold or leased or services rendered, and all proceeds of any of the forgoing.

**B.** Crestmark shall have all of the rights of a secured party under the UCC with respect to the Collateral. Borrower grants Crestmark the authority to file all appropriate documentation for Crestmark to perfect its security interest in the Collateral, including a UCC-1 financing statement listing the Collateral as "All assets of the Debtor, now existing and hereafter arising, wherever located," or similar terms, as well as UCC-3 amendments as may be required from time to time. All expenses of Crestmark relating to searching, filing or protecting the Security Interest are part of the Obligations.

**C.** The Security Interest gives Crestmark rights with respect to the Collateral and the Security Interest and this Agreement imposes duties upon Borrower which relate to the Collateral. Some of such rights and duties are: (i) the right of Crestmark at any time to notify any persons who may hold any part of the Collateral, such as Account Debtors and other debtors, of Crestmark's Security Interest. Borrower understands that Crestmark may verify Accounts with the Account Debtors; (ii) Borrower must cooperate with Crestmark in obtaining control of any Collateral in the possession of third persons, particularly Collateral consisting of deposit accounts, investment property, letter of credit rights or other Collateral which is evidenced by electronic entries; (iii) except for the right of Borrower to sell its inventory in the ordinary course of business, Borrower shall not sell or transfer any of the Collateral or grant any other security interest in the Collateral, except as Crestmark may specifically agree to in writing. Borrower remains liable to perform all of its obligations with respect to the Collateral such as the recognition of any warranties in inventory sold and Crestmark is under no responsibility to perform any of the obligations of Borrower; and (iv) Borrower must notify Crestmark immediately if it knows that any Account Debtor disputes an Account whether or not such disputes are deemed valid by Borrower.

**9. POWER OF ATTORNEY.** Borrower irrevocably appoints Crestmark, or any person(s) designated by Crestmark, as its attorney-in-fact, which appointment is coupled with an interest and shall remain in full force and effect until all Obligations of Borrower to Crestmark have been fully satisfied and discharged, with full power, at Borrower's sole expense, to exercise at any time in Crestmark's reasonable discretion all or any of the following powers:

**A.** Receive, take, endorse, assign, deliver, accept and deposit, in the name of Crestmark or Borrower, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof.

**B.** Change Borrower's address on all invoices and statements of Account mailed or to be mailed to Borrower's customers and to substitute thereon the address designated by Crestmark, to place legends on all invoices and statements of Account mailed or to be mailed to Borrower's customers, and to receive and open all mail addressed to Borrower, or to Borrower's trade name at Crestmark's address, or any other designated address.

**C.** Upon and after the occurrence of a Default, to change the address for delivery of Borrower's mail to Crestmark's or an address designated by Crestmark. Borrower specifically

authorizes Crestmark to sign any forms on behalf of Borrower to affect this change with the United States Postal Service or any third party and requests such change to be accepted.

**D.** Upon and after the occurrence of a Default, to take or bring, in the name of Crestmark or Borrower, all steps, actions, suits or proceedings deemed by Crestmark necessary or desirable to effect collection of or other realization upon any Collateral.

**E.** Execute on behalf of Borrower any UCC-1 and/or UCC-3 Financing Statement(s) and/or any notices or other documents necessary or desirable to carry out the purpose and intent of this Agreement, and to do any and all things reasonably necessary and proper to carry out the purpose and intent of this Agreement.

**F.** Upon and after the occurrence of a Default, to transfer any lockboxes belonging to Borrower to Crestmark at Crestmark's sole discretion.

**G.** Upon and after the occurrence of a Default, to initiate ACH transfers from Borrower's depository accounts.

**H.** Upon and after the occurrence of a Default, to endorse and take any action with respect to bills of lading covering any inventory.

**I.** Upon and after the occurrence of a Default, or at any time in the event that Borrower fails to do so within a reasonable time, execute, file and serve, in its own name or in the name of Borrower, mechanics lien or similar notices, or claims under any payment or performance bond for the benefit of Borrower.

**J.** Upon and after the occurrence of a Default, or at any time in the event that Borrower fails to do so within a reasonable time, pay any sums necessary to discharge any lien or encumbrance on the Collateral, which sums shall be included as Obligations hereunder, and which sums shall accrue interest at the Extra Rate until paid in full.

**10. <u>REPRESENTATIONS</u>.** Borrower makes the following representations and warranties to Crestmark and such representations and warranties must be true at all times until the Obligations are paid in full. If Borrower learns that a representation and warranty once made is no longer true, it has the duty to immediately notify Crestmark in writing:

**A.** Borrower is in good standing under the laws of the state of its organization and is authorized to conduct business in any state that it conducts business. Borrower has the power and authority to enter into this Agreement, and the persons signing this Agreement and all persons who sign any documents with Crestmark have the appropriate authority. Borrower's organization identification number, state of organization, and addresses where it conducts business is as shown on the Schedule.

**B.** Borrower's entry into the Loan Documents do not violate any agreement which Borrower has or which binds Borrower.

**C.** The Loan Documents are fully enforceable against Borrower and the Collateral.

**D.** There are no litigation or criminal charges pending or threatened against Borrower or Guarantor and neither Borrower nor Guarantor are in default of any order or judgment of any

court or any governmental agency of any kind. There are no unsatisfied liens or judgments pending against Borrower in any jurisdiction except as shown on the Schedule.

E. The financial information furnished by Borrower to Crestmark has been prepared in accordance with generally accepted accounting principles, all financial statements are true and correct, and any projections of the business operations of Borrower that have been given or will be given to Crestmark in the future will be based upon Borrower's reasonable assumptions and estimates.

F. Borrower is the owner of all of the Collateral and there are no other liens or claims against the Collateral, except the Security Interest of Crestmark or as shown on the Schedule.

G. All of the Collateral is personal property and none of the Collateral will be permanently affixed to real estate.

H. Borrower has filed and will file all federal, state, local and foreign tax returns that it is required to file and has paid and will pay all taxes and all other governmental charges as they become due.

I. Borrower is able to pay its debts as they become due and has sufficient capital to carry on its business. Borrower's obligations under this Agreement and the Loan Documents, including the obligation to repay the Loan and the grant of the Security Interest, do not render Borrower insolvent.

J. Borrower only uses the fictitious names, d/b/a's, tradenames and tradestyles set forth on the Schedule (collectively the "Tradenames"), and Borrower certifies that all sales and any and all business done in the name of the Tradenames are the sales and business of Borrower. Any and all checks, remittances or other payments received in the name of any of the Tradenames are Borrower's sole and exclusive property, and are subject to Crestmark's security interest hereunder. Any and all authority given to Crestmark by Borrower in this Agreement or elsewhere to endorse Borrower's name on any checks, negotiable instruments or other remittances extends with equal and full force and effect to any checks, negotiable instruments, and other remittances received in the name of any Tradename.

K. All Accounts assigned to Crestmark by Borrower are and will at all times be bonafide accounts arising from the sale of inventory or providing services, and may be subject to reasonable and customary discounts, deductions, allowances, contra items, offsets or counterclaims as allowed by Crestmark, and are free and clear of all encumbrances of any kind whatsoever, except as disclosed to Crestmark in writing and approved by Crestmark in writing.

L. Borrower's assignment of any Accounts to Crestmark pursuant to this Agreement will not at any time violate any federal, state and/or local law, rule or regulation, court or other governmental order or decree or terms of any contract relating to such Accounts.

M. Borrower possesses all necessary trademarks, trade names, copyrights, patents, patent rights and licenses to conduct its business as now operated, without any known conflict with any trademarks, trade names, copyrights, patents and license rights of any other person or entity.

N. Borrower's legal name as of the date hereof as it appears in its official filing with its state of organization is as set forth in the opening paragraph of this Agreement. Borrower has

not organized another entity or Tradename using Borrower's name or Tradename as set forth herein in any other jurisdiction.

O. As to all of Borrower's Inventory and Equipment:

i. The Inventory and Equipment are currently located only at the locations identified on the Schedule, or such other locations as consented to by Crestmark in writing;

ii. All Inventory is now and at all times hereafter shall be of good and merchantable quality, free from defects, except as disclosed to Crestmark in writing;

iii. The Inventory and Equipment are and shall remain free from all liens, claims, encumbrances, and security interests (except as held by Crestmark, and except as identified on the Schedule).

iv. The Inventory is not now stored with a bailee, warehouseman or similar party unless such party has entered into a waiver letter in form satisfactory to Crestmark.

**11. <u>BORROWER'S PROMISES</u>.** Borrower makes the following promises to Crestmark and these promises are effective until the Obligations are fully paid:

**A.** To pay all Obligations when due and perform all terms, conditions and obligations of the Loan Documents.

**B.** To permit Crestmark, or its representatives, access to the Collateral on Borrower's premises and to Borrower's computer systems, books of account and financial records. Borrower will pay the cost of Field Examinations as specified in the Schedule.

**C.** To notify Crestmark promptly of any litigation, administrative or tax proceeding or other action threatened or instituted against Borrower or Guarantor or its property, or of any other material matter which may adversely affect Borrower's financial condition. The amount of claims as to which Borrower must notify Crestmark is specified in the Schedule as the "Borrower Claims Threshold".

**D.** To pay when due all taxes, assessments and governmental charges, provided that Borrower has the right to contest the same as long as it has a cash reserve with Crestmark in an amount as determined by Crestmark in its sole discretion.

**E.** To comply with the Financial Covenants described in the Schedule (if applicable).

**F.** To maintain insurance on its business activities in such amount and in such form as Crestmark may from time to time require, and with respect to such insurance if so designated, Crestmark shall be named as "Lender Loss Payee" and/or "Additional Insured", as applicable, under the policy and receive evidence of the insurance. All insurance which protects Crestmark shall have at least a 30-day notice to Crestmark prior to any cancellation. With respect to the insurance, Borrower appoints Crestmark as its attorney-in-fact to negotiate any and all claims under all insurance policies and Crestmark also has the power to negotiate any payments on the insurance policies.

**G.** To comply with all laws, ordinances and regulations or other requirements of any governmental authority or agency applicable to Borrower's business.

H. To maintain and preserve all Collateral in good repair, working order and condition, and with respect to accounts, pursue collections thereof.

I. To provide Crestmark with evidence of ownership of any Collateral upon the request of Crestmark.

J. To maintain a Loan Amount balance which shall not exceed the sum of Eligible Collateral times the corresponding Advance Rate.

12. **NEGATIVE COVENANTS**. Borrower agrees until the Obligations are paid in full, it will not:

A. Change its state of organization or its name, or move its executive office or at any time adopt any assumed name without giving Crestmark at least 30 days prior written notice.

B. Declare or pay any dividend or make any other distribution with regard to its equity or purchase or retire any of its equity without Crestmark's prior written consent, provided if it is taxed as an S Corporation or other "pass through" entity, Borrower may prior to a Default distribute profits to its equity holders in an amount necessary to enable such holders to pay personal, state and federal taxes directly attributable to the profits earned by Borrower for such year.

C. Obtain any loan or guaranty or assume any obligation or liability, whether as borrower, guarantor, surety, indemnitor or otherwise (a "Borrower Obligation") (i) that would result in or create a Default, or (ii) that together with all other existing Borrower Obligations would exceed the "Borrower Obligation Threshold" set forth in the Schedule, without Crestmark's prior written consent.

D. Enter into any transaction with its equity holders or any affiliates of Borrower except on terms at least as favorable as would be usual and customary in similar transactions if the person with whom the transaction is entered into was not related to Borrower.

E. Release, redeem, purchase, or acquire any of its equity interests without the prior written consent of Crestmark.

F. Default in the payment of any debt to any other person.

G. Suffer or permit any judgment, decree or order not fully covered by insurance to be entered against Borrower or a Guarantor in an aggregate amount in excess of the "Claims Threshold", or permit or suffer any warrant or attachment to be filed against Borrower, any Guarantor, or against any property or asset of Borrower or Guarantor.

H. Transfer the ownership of any equity interest in Borrower without the prior written consent of Crestmark which shall not be unreasonably withheld.

I. Sell any of the Collateral outside the normal course of its business without the prior written consent of Crestmark.

J. Purchase the stock or assets of any other entity without the prior written consent of Crestmark.

13. FINANCIAL REPORTS. Borrower promises that until the Obligations are fully paid and this Agreement is terminated, it will keep its books and records in a manner satisfactory to Crestmark and Crestmark will have the right at any time to verify any of the Collateral, documentation or books and records of Borrower in whatever manner and as often as Crestmark deems necessary. Borrower will permit Crestmark, or its representatives, access to the Collateral and Borrower's premises and to Borrower's computer systems, books of account and financial records. Borrower will furnish to Crestmark the financial reports identified on the Schedule, certified to by the president or chief financial officer of Borrower and Borrower's certified public accountant, if applicable. All financial reports will be prepared in accordance with generally acceptable accounting principles and will be true and accurate.

14. CRESTMARK'S REMEDIES. Crestmark has all the remedies available at law or in equity (including those under the UCC) in the event of a Default or if Borrower fails to pay the Obligations on demand, including but not limited to the following: to charge the Extra Rate; to notify Account Debtors to make the payments directly to Crestmark; to settle or compromise any disputed Account, sue on any Account and make any agreement to deal with the accounts as if it were the owner; to offset any of Borrower's or Guarantor's funds under the control of Crestmark against the Obligations; and to require Borrower to gather up the Collateral and make it available to Crestmark for Crestmark to conduct public or private UCC foreclosure sales. Borrower grants to Crestmark a license or other right to use, without charge, Borrower's labels, patents, copyrights, trademarks, rights of use of any name, trade secrets, tradenames and advertising materials, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale and selling any Collateral, and Borrower's rights under all licenses and franchise agreements shall inure to Crestmark's benefit. If Crestmark should proceed against the Collateral and sell any of the Collateral on credit, Borrower will be credited on the Obligations only with the amount actually received by Crestmark and Borrower waives any and all provisions as to notice or a particular method of sale of any of the Collateral. Borrower will pay all expenses in connection with the assembly or sale of the Collateral. Crestmark does not have to incur its own expenses in realizing upon the Collateral, but all the expenses are for the account of Borrower. Borrower recognizes that at no time is Crestmark its agent in dealing with the Collateral, but Crestmark acts only in its own interest.

15. CUMULATIVE RIGHTS. Crestmark's rights and remedies under this Agreement and all other agreements shall be cumulative. Crestmark shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Crestmark of one right or remedy shall be deemed an election, and no waiver by Crestmark of any Default on Borrower's part shall be deemed a continuing waiver. No delay by Crestmark shall constitute a waiver, election or acquiescence by it.

16. LENDER ACTIONS. To the extent applicable law may impose duties on Crestmark to exercise remedies in a commercially reasonable manner, Borrower agrees that it is not commercially unreasonable for Crestmark: to fail to exercise remedies against any Collateral or any particular Account Debtor; to proceed against Account Debtors either directly or through collection agencies; to advertise disposition of Collateral through publications or media of general circulation; to hire professional auctioneers to dispose of Collateral; to dispose of Collateral in wholesale or retail markets; to disclaim warranties with respect to Collateral; or to obtain services of attorneys or other professionals. The foregoing is not an exhaustive list and nothing contained in the foregoing shall be construed to grant any rights to Borrower or to impose any duties on Crestmark that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 16. Borrower agrees that under no circumstances is Crestmark the agent or representative of Borrower.

17. APPLICATION OF PROCEEDS. Once collection efforts are commenced by Crestmark, any proceeds of sale or disposition of Collateral may be applied by Crestmark first to expenses authorized by this Agreement, including Crestmark's reasonable attorneys' fees, which Borrower must pay,

and the balance to payment of the Obligations in such manner as Crestmark may elect. Borrower and Guarantor remain liable for any deficiency.

18. NOTICES. Any notice is effective by either party if sent in writing or facsimile with confirmation of receipt or by certified mail or personal delivery or expedited mail services to the addresses shown on the Schedule.

## 19. MISCELLANEOUS PROVISIONS.

A. This Agreement is binding upon and is for the benefit of Borrower and Crestmark, and their respective successors and assigns. However, under no circumstances may Borrower assign this Agreement or its rights and duties hereunder. Crestmark may assign this Agreement and its rights under the Loan Documents and Borrower will make payments to any such assignee if so directed.

B. Crestmark has the right at any time to assign, transfer, negotiate or sell participations in this Agreement or the Obligations or the rights of Crestmark hereunder. In connection with any assignment, Borrower consents to disclosure of any and all books, records, files, Loan Documents and all other documents in the possession or under the control of Crestmark.

C. No delay or failure of Crestmark in exercising any right or remedy will affect such right or remedy. No delay or failure of Crestmark to demand strict adherence to the terms of this Agreement will be deemed to waive Crestmark's rights to demand such adherence at any time in the future.

D. The term "including" means "including, without limitation", and the term "includes" means "includes, without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined.

E. This Agreement and the other Loan Documents will be interpreted and determined under the laws of the State of Michigan without any regard to any conflict of laws provisions.

F. Borrower, at Crestmark's request, will make, execute and acknowledge any and all further instruments or agreements necessary to carry out the intent of this Agreement and the other Loan Documents.

G. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile or electronic mail to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

H. Neither Crestmark nor its affiliates directors, officers, agents, attorneys or employees are liable to Borrower or Guarantor or affiliates for any action taken or omitted by it or any of them under the Loan Documents except for such liability as may be imposed by law for gross negligence or actual fraud, and no claim shall be made by Borrower or Guarantor or any of

Borrower's affiliates, directors, officers, agents, employees for any special or consequential damages or punitive damages arising out of, or related to the Loan Documents or the transactions between the Parties.

I. This Agreement and the other Loan Documents represent the complete Agreement between the parties with respect to the subject matter of this Agreement, and there are no promises, undertakings, representations or warranties by Crestmark relative to the subject matter of this Agreement not expressly set forth in this Agreement or the other Loan Documents. This Agreement and the other Loan Documents may be amended only in writing.

J. If any provision of this Agreement is in conflict with any law or statute or is otherwise unenforceable, then the provision will be deemed null and void only to the extent of such provision and the provision will be deemed severable and the remainder of this Agreement shall be in full force and effect.

K. Any payment made to Crestmark by either Borrower or Guarantor which is subsequently invalidated, declared fraudulent or preferential or otherwise set aside under any bankruptcy, state, federal or equitable law, then to the extent of such invalidity such payment will be deemed not to have been made and the obligation will continue in full force and effect. This provision shall survive termination of this Agreement.

L. **No Lien Termination Without Release** - In recognition of among other things, Borrower's indemnification obligations and Crestmark's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Borrower, Crestmark shall not be required to record any terminations or satisfactions of any of its liens on the Collateral unless and until Borrower and all guarantors of its Obligations have executed and delivered to Crestmark a general release in a form acceptable to Crestmark in its sole discretion. Borrower understands that this provision constitutes a waiver of its rights Borrower may have under §9-513 of the UCC.

M. **USA Patriot Act Notification** – The following notification is provided to Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

> **IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT**. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan or other extension of credit. Crestmark may ask for the name, address, date of birth, and other information that will allow us to identify all Borrowers, principals and owners. Crestmark may also ask to see your driver's license or other identifying documents.

**20.** [Intentionally left blank]

21. **INDEMNIFICATION.** Borrower hereby agrees to indemnify, defend and hold Crestmark and its executive committees, parent affiliates, subsidiaries, agents, directors, officers, participants, employees, agents and their successors and assigns (collectively "Indemnified Parties") harmless against any and all liabilities of any kind, nature or description and damages whether they are direct, indirect or consequential, including attorney's fees and other professionals and experts incurred or

suffered directly or indirectly by Indemnified Parties or asserted against Indemnified Parties by anyone whosoever, including Borrower or Guarantor, which arise out of the Loan Documents or the relationship and transaction between the Parties. This provision shall survive the termination of this Agreement.

22. **JOINT AND SEVERAL OBLIGATIONS.** If more than one person or entity is named as Borrower in this Agreement, all Obligations, representations, warranties, covenants and indemnities of Borrower set forth herein and in the other Loan Documents shall be the joint and several obligations of such persons and/or entities. Each Borrower hereby appoints each other Borrower as its true and lawful attorney-in-fact, with full right and power, for purposes of exercising all rights of such person under this Agreement and applicable law with regard to the transactions contemplated under this Agreement. The foregoing is a material inducement to the agreement of Crestmark to enter into this Agreement and to consummate the transactions contemplated under this Agreement. Each Borrower represents that all Borrowers are operated as part of one consolidated business entity and are direly dependent upon each other for, and in connection with, their respective business activities and financial resources. Each Borrower will receive a direct economic and financial benefit from the obligations incurred under this Agreement and the incurrence of such obligations is in the best interest of each Borrower.

23. **JURISDICTION.** BORROWER AND GUARANTOR AGREE THAT ANY ACTION TO ENFORCE BORROWER'S OR GUARANTOR'S OBLIGATIONS TO CRESTMARK SHALL BE PROSECUTED EITHER IN THE CIRCUIT COURT OF OAKLAND COUNTY MICHIGAN OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN (UNLESS CRESTMARK, IN ITS SOLE DISCRETION, ELECTS SOME OTHER JURISDICTION), AND BORROWER AND GUARANTOR SUBMIT TO THE JURISDICTION OF ANY SUCH COURT SELECTED BY CRESTMARK. BORROWER AND GUARANTOR WAIVE ANY AND ALL RIGHTS TO CONTEST THE JURISDICTION AND VENUE OF ANY ACTION BROUGHT IN THIS MATTER AND BORROWER AND GUARANTOR MAY BRING ANY ACTION AGAINST CRESTMARK ONLY IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND OR THE FEDERAL COURT OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.

24. **WAIVER.** ALL PARTIES, INCLUDING BORROWER AND GUARANTOR EACH KNOWINGLY AND VOLUNTARILY WAIVE ANY CONSTITUTIONAL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM, DISPUTE OR CONFLICT BETWEEN THE PARTIES OR UNDER THE LOAN DOCUMENTS AND AGREE THAT ANY LITIGATION SHALL BE HEARD BY A COURT OF COMPETENT JURISDICTION SITTING WITHOUT A JURY. BORROWER AND GUARANTOR ACKNOWLEDGE THAT THEY HAVE HAD THE OPPORTUNITY TO REVIEW THE EFFECT OF THIS PROVISION WITH COUNSEL OF THEIR CHOICE.

25. **RELEASE. BORROWER AND GUARANTOR RELEASE AND FOREVER DISCHARGE CRESTMARK, ITS AFFILIATES, OFFICERS, AGENTS, EMPLOYEES AND DIRECTORS FROM ANY AND ALL CLAIMS OF ANY KIND WHATSOEVER FROM THE BEGINNING OF TIME TO DATE OF THIS AGREEMENT.**

The parties have executed this Agreement as of the date and year first written above.

**CRESTMARK, A DIVISION OF METABANK,** a federal savings bank

By: [signature]
Name: PAUL MASSERANO
Its: VP

**BORROWER:**

**PRIMROSE CANDY CO.,**
an Illinois corporation

By:__________________________
Name: Jeffrey Puch
Its: President

By signing this Agreement, each undersigned Guarantor agrees it has read and understands the Agreement and agrees to all of its terms.

**GUARANTOR:**

**CANDY MAE, INC.,**
an Illinois corporation

By:__________________________
Name: Jeffrey Puch
Its: President

**MAE PUCH, LTD.,**
an Illinois corporation

By:__________________________
Name: Jeffrey Puch
Its: President

**J & M PARTNERSHIP**

By:__________________________
Name: Jeffrey Puch
Its: Managing Partner

# SCHEDULE TO LOAN AND SECURITY AGREEMENT

This Schedule is part of the Loan and Security Agreement dated February 24, 2021 between:

CRESTMARK. A DIVISION OF METABANK ("CRESTMARK")
5480 CORPORATE DRIVE
SUITE 350
TROY, MICHIGAN 48098

AND

PRIMROSE CANDY CO. ("BORROWER")
4111 W. PARKER AVE.
CHICAGO, ILLINOIS 60639

The following paragraph numbers correspond to paragraph numbers contained in the Agreement.

2. **LOAN; LOAN ADVANCES.**

Advance Formula: Advances of the Loan may be measured against a percentage of Eligible Accounts, Eligible Inventory and Marketable Securities.

The Loan Amount may not exceed an amount which is the lesser of:

(a) Six Million Dollars ($6,000,000.00) ("Maximum Amount"); or

(b) the sum of:

(i) Eighty-five percent (85%) of Eligible Accounts, PLUS

(ii) the lesser of Two Million Dollars ($2,000,000.00); fifty percent (50%) of Eligible Inventory (determined as of the date with the Inventory Reporting provided in paragraph 13 below); or (x) one hundred percent (100%) of (b)(i) above from May through September, (y) seventy-five percent (75%) of (b)(i) above during October, and (z) fifty percent (50%) of (b)(i) above from November through April, PLUS

(iii) the lesser of One Million Five Hundred Thousand Dollars ($1,500,000.00) or eighty percent (80%) of the Marketable Securities pledged to Crestmark and subject to a control agreement acceptable to Crestmark in its sole discretion.

(subparagraphs (i) – (iii) are collectively the "Advance Formula").

Crestmark in its sole discretion may raise or lower any percentage advance rate with respect to the Advance Formula.

**Eligible Accounts** means and includes those Accounts:

(i) which have been validly assigned to Crestmark;
(ii) strictly comply with all of Borrower's promises, warranties and representations to Crestmark;
(iii) contain payment terms of not greater than ninety (90) days from the date of invoice;
(iv) are not unpaid than ninety (90) days past the date of invoice; and
(v) are invoiced not later than ten (10) days from the date of service or sale.

Eligible Accounts shall not include the following:

(a) Accounts with respect to which the Account Debtor is an officer, employee or agent of Borrower;
(b) Accounts with respect to which services or goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional;
(c) Accounts with respect to which the Account Debtor is not a resident of the United States or Canada; provided, however, all Accounts originating from the Province of Quebec shall be deemed ineligible;
(d) Accounts with respect to which the Account Debtor is the United States or any department, agency or instrumentality of the United States; provided, however, that an Account shall not be deemed ineligible by reason of this clause (d) if the Borrower has completed all of the steps necessary, in the sole opinion of Crestmark, to comply with the Federal Assignment of Claims Act of 1940 (31 U.S.C. Section 3727) with respect to such Account;
(e) Accounts with respect to which the Account Debtor is any state of the United States or any city, town, municipality, county or division thereof;
(f) Accounts with respect to which the Account Debtor is a subsidiary of, related to, affiliated with, or has common shareholders, officers or directors with Borrower;
(g) Accounts with respect to which Borrower is or becomes liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower;
(h) those Accounts where Crestmark has notified Borrower that, in Crestmark's sole discretion, the Account or Account Debtor is not acceptable to Crestmark;
(i) all of the Accounts owed by an Account Debtor who is the subject of a bankruptcy, receivership or similar proceeding;
(j) all of the Accounts owed by an Account Debtor where twenty (20%) percent or more of all of the Accounts owed by that Account Debtor are unpaid more than ninety (90) days from the invoice (except for the Account Debtor Ferrara only during the first ninety (90) days after the date of the Agreement);
(k) Accounts for which the services have not yet been rendered to the Account Debtor or the goods sold have not yet been delivered to the Account Debtor (commonly referred to as "pre-billed accounts");
(l) COD, credit card sales and cash sales;
(m) Accounts that are disputed.

**"Eligible Inventory"** means and includes that Inventory (other than packaging materials, chemicals, additives, promotional items, labels and supplies) which Crestmark, in its sole credit judgment, deems to be Eligible Inventory. Without limiting the generality of the forgoing, no Inventory shall be Eligible Inventory unless:

(i) it is finished goods, including private label goods;
(ii) at all times it strictly complies with all of Borrower's promises, warranties and representations to Crestmark;
(iii) it is in good, new and salable condition;
(iv) it is not slow moving, obsolete or unmerchantable, in Crestmark's sole and absolute discretion;
(v) it meets all standards imposed by any governmental agency or authority or any insurer;
(vi) it is at all times subject to Crestmark's duly perfected, first priority security interest and there exists no other lien or encumbrance other than as permitted hereunder; and
(vii) it is in Borrower's possession and control situated at a location in compliance with this Agreement, including any leased premises covered by a landlord agreement in favor of Crestmark.

Eligible Inventory shall not include Inventory that:

(a) is in the hands of any third party, including a warehouseman, finisher, consignee, etc., unless Crestmark shall have received a warehouseman's waiver or a third party processor's waiver from such warehouseman, finisher, consignee, etc.;
(b) is subject to any license or other agreement that limits, conditions, or restricts Borrower's or Crestmark's right to sell or otherwise dispose of such Inventory;
(c) is not of a type that Crestmark, in its commercially reasonable discretion, has determined is not Eligible Inventory; or
(d) is not in Borrower's possession based upon consignment, guaranteed sale, or other terms by reason of which the payment by Borrower may be conditional.

Crestmark will determine in its sole discretion whether any Collateral is eligible for an Advance, but no Collateral will be considered eligible unless the requirements set forth above are met. Regardless of whether any Collateral is eligible, it is still part of the Collateral securing the Obligations.

Borrower will provide a Borrowing Base Certificate in the form approved by Crestmark in its sole discretion before each Advance is made, but not less than once per week. In addition, prior to any request for an Advance, upon request by Crestmark, Borrower must furnish to Crestmark invoices, credit memos, sales and cash receipt journals, purchase orders, evidence of delivery, proof of shipment, timesheets or any other documents Crestmark requests, in its sole discretion, with respect to the Collateral to support the Advance. Crestmark will endeavor to provide the requested funds by the end of the same business day that it receives the request so long as the complete package of information for the request has been received by 10:30 a.m. Eastern Time that day. All requests for funding will be subject to Crestmark's then standard fees for electronic funds transfer, wire transfers and check services.

Each time an Advance is made, the amount of the Obligations will be increased by the amount of the Advance. On the later of three (3) business days ("Clearance Days") after checks, ACH or wire transfers or other credit instruments are deposited in the Lockbox Account, and upon receipt of the Borrowing Base Certificate reflecting such deposit, Crestmark will credit the Loan Account with the net amount actually received, whereupon interest and the Maintenance Fee will no longer be charged. On the date a Borrowing Base Certificate is received on the net funds actually received, Borrower will receive immediate credit on such funds in determining availability for Advances.

**4. <u>FEES AND EXPENSES</u>.** The following fees will be paid by Borrower:

**<u>Loan Fee</u>:** At closing of the Loan and on each one year anniversary of the date of the Agreement, Borrower will pay Crestmark a loan fee in the aggregate amount of one percent (1%) of the Maximum Amount, which will be fully earned as of such date and not refundable in any event. Notwithstanding the foregoing, with respect to the initial Loan Fee due at closing only, Borrower shall have the option to pay such Loan Fee in twelve (12) equal consecutive monthly payments commencing on date of execution of this Agreement and continuing on the first day of each month thereafter.

**<u>Late Reporting Fee</u>:** Borrower will pay Crestmark a Late Reporting Fee in an amount equal to One Hundred Fifty ($150.00) Dollars per document per business day for any day in which any report, financial statement or schedule required by the Agreement is delivered late.

**<u>Lockbox Fee</u>:** Each month Borrower will pay all costs in connection with the Lockbox and the Lockbox Account, as determined by Crestmark from time to time.

**Documentation Fee:** In consideration of the extension of the Loan and the execution of this Agreement, Borrower will pay Crestmark its fees and costs incurred in documenting and closing the Loan.

**Exit Fee:** Borrower may elect to prepay the Obligations but only upon the payment of all Obligations including the following exit fee ("Exit Fee"), as liquidated damages and not as a penalty: (i) prior to the one year anniversary date of the Agreement, the exit fee will be two (2.00%) percent of the Maximum Amount plus any fees due or to become due under the Agreement, and (ii) on and after the one year anniversary date but prior to the two year anniversary date, the exit fee will be one percent (1.00%) of the Maximum Amount plus any fees due or to become due under the Agreement. No partial prepayment will affect the Borrower's obligation to continue the regular payments due under the Note.

The Exit Fee in the one percent (1.00%) of the Maximum Amount plus any fees due or to become due under the Agreement shall automatically renew after the two year anniversary date of the Agreement for one additional year unless (i) Borrower notifies Crestmark in writing within sixty (60) days before such anniversary date of Borrower's intention to terminate the Agreement and (ii) the Obligations are paid in full by such anniversary date. In the event that a Default has occurred and is continuing at the time Crestmark demands payment of the Obligations, the Exit Fee will be due and payable by Borrower.

**Minimum Loan Balance:** Borrower shall maintain an average outstanding principal balance of the Loan for each month in the amount of Two Million Dollars ($2,000,000.00) ("Minimum Loan Balance"). If the actual average outstanding principal balance of the Loan in any month is less than the Minimum Loan Amount, Borrower must pay interest for such month calculated on the Minimum Loan Balance.

5. **LOCKBOX.**

The Lockbox Account means:

Drawer # 2596
PO Box 5935
Troy, MI 48007-5935

10. **REPRESENTATIONS.**

(A) Borrower is an Illinois corporation

(C) List pending and threatened litigation and unsatisfied judgments: None.

(F) List Security Interests in the Collateral held by creditors other than Crestmark as Permitted Encumbrances: None.

**NOTE:** The listing of the interests noted above shall not, in any manner whatsoever, be deemed to be an acknowledgement by Crestmark as to the perfection, priority, validity or enforceability thereof.

(J) List Borrower's Trade names: None.
List Borrower's Trademarks: Traditionally The Best, Caramel Apple Kisses, Black Taffy and Popin Peanut Brunce

11. **BORROWER'S PROMISES.**

C. BORROWER CLAIMS THRESHOLD: $50,000.00.

E. FINANCIAL COVENANTS:

Borrower will minimum Tangible Net Worth at least equal to the Borrower's actual Tangible Net Worth as of December 31, 2020 less $1,000,000.00 tested within 30 days of the end of each quarter. "Tangible Net Worth" means, as of the date of determination, total assets less total liabilities less the sum of (i) the aggregate amount of non-trade Accounts Receivable, including Accounts Receivable from affiliated or related Persons; (ii) prepaid expenses; (iii) deposits; (iv) net leasehold improvements; (v) goodwill; and (vi) any other asset which would be treated as an intangible asset under GAAP, plus Subordinated Debt. "Subordinated Debt" means any and all indebtedness presently or in the future incurred by Borrower to any creditor of Borrower entering into a written subordination agreement with Crestmark.

In addition, at no time shall Borrower make any loans, advances, intercompany transfers or cash flow, between Borrower and any subsidiary, related entity or affiliate of Borrower or with any company that has common shareholders, officers or directors with Borrower.

All of the financial covenants in this Agreement shall be determined in accordance with GAAP, unless otherwise provided.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board that are applicable to the circumstances as of the date of determination and applied on a consistent basis.

F. REQUIRED INSURANCE. Without limiting Crestmark's requirement for insurance coverage, which may change from time to time, the following is/are the minimum insurance requirements:

Property Damage: "Crestmark, a division of MetaBank, ISAOA" named as Lender Loss Payee

General and Professional Liability: "Crestmark, a division of MetaBank, ISAOA" named as Additional Insured for an amount not less than the smallest amount required under any contract with any Account Debtor.

12. C. OBLIGATION THRESHOLD: $50,000.00.

13. <u>FINANCIAL REPORTS.</u>

**Management Prepared Financial Statements:** Borrower will deliver to Crestmark monthly management prepared financial statements, balance sheets, and profit and loss statements for the month then ended, certified to by the president or chief financial officer of Borrower. Such reports will set forth the financial affairs and true condition of Borrower for such time period and will be delivered to Crestmark no later than thirty (30) days after the end of each month.

**Annual Financial Statements:** Each year Borrower will deliver to Crestmark annual CPA compiled financial statements, cash flow statements, balance sheets, and profit and loss statements prepared by a certified public accountant acceptable to Crestmark, all without exceptions. Such reports will set forth

in detail Borrower's true condition as of the end of Borrower's fiscal year no later than one hundred fifty (150) days after the end of Borrower's fiscal years.

**Projections:** Upon request, Borrower shall deliver to Crestmark, within sixty (60) days prior to each year-end, an annual financial projection including balance sheet, income statements, and statement of cash flows together with assumptions for the following year, broken down monthly

**Tax Returns:** Upon request, Guarantor and Borrower will each provide Crestmark with current annual tax returns prior to April 15 of each year or if an extension is filed, at the earlier of (a) filing, or (b) the extension deadline.

All financial statements are and will be prepared in accordance with GAAP applied on a consistent basis.

**Accounts Receivable, Accounts Payable Aging and Inventory Reports:** Borrower will furnish to Crestmark the following certified to by the president or chief financial officer of Borrower within the time periods set forth:

(a) **Accounts Receivable Reports:** Monthly detailed Accounts Receivable Aging Reports no later than fifteen (15) days after the end of each month;

(b) **Accounts Payable Reports:** Monthly detailed Accounts Payable Aging Reports no later than fifteen (15) days after the end of each month; and

(c) **Inventory Reports:** Monthly Inventory certification reports no later than fifteen (15) days after the end of each month. The certification must list Inventory by category and location as of month end.

**Field Examinations:** Borrower will reimburse Crestmark for the costs to perform three (3) field examinations per year of Borrower's books and records, assets and liabilities, to be performed by Crestmark's inspector, whether a Crestmark officer or an independent party with all expenses, (whether for a Crestmark employee or otherwise), including all out of pocket expenses including, but not limited to, transportation, hotel, parking, and meals paid by Borrower. Upon Default, the number of field examinations to be reimbursed by Borrower may be increased in Crestmark's sole discretion. Field examinations are performed for Crestmark's internal use and Crestmark has no obligation to provide Borrower or Guarantor with the results of the examination or copies of any reports or work papers in whole or in part.

**Tax Deposit Evidence:** Upon Crestmark's request, submit weekly payroll summaries and evidence of tax payments together with copies of bank statements from which the funds are impounded.

**Customer Lists:** Upon Crestmark's request, Borrower will deliver to Crestmark detailed customer lists showing the customer's name, address, phone number and any other information Crestmark reasonably requests.

**Other Information:** Borrower and Guarantor will also deliver to Crestmark such other financial statements, financial reports, documentation, tax returns and other information as Crestmark requests from time to time.

**18. NOTICES.** Addresses for Notices are as set forth at the beginning of this Schedule.

[SIGNATURE PAGE TO SCHEDULE TO LOAN AND SECURITY AGREEMENT]

**PRIMROSE CANDY CO.,**
an Illinois corporation

By: ______________________
Name: Jeffrey Puch
Its: President

**CRESTMARK, A DIVISION OF METABANK**

By: ______________________
Name: PAUL MASSEANG
Its: VP



5140300.v2

## AMENDMENT TO SCHEDULE TO LOAN AND SECURITY AGREEMENT

This Amendment to Schedule to Loan and Security Agreement is dated as of ~~October~~ November 8, 2021, between Crestmark, a division of MetaBank, National Association ("Crestmark"); Primrose Candy Co., an Illinois corporation ("Borrower"); and Candy Mae, Inc., an Illinois corporation, Mae Purch, Ltd, an Illinois corporation, and J & M Partnership, an Illinois limited partnership (collectively the "Guarantors"). This Amendment (the "Amendment") amends that certain Loan and Security Agreement and related Schedule to Loan and Security Agreement each dated as of February 24, 2021 (as amended, collectively referred to herein as the "Agreement").

**BACKGROUND:**

The parties have executed the Agreement and Loan Documents (as defined in the Agreement);

The Borrower and Guarantors are indebted and/or obligated to Crestmark without offset or deduction pursuant to the Agreement and the Loan Documents all of which are in full force and effect;

Borrower, Crestmark, and Guarantors, desire to modify and amend certain terms, conditions, covenants and obligations contained in the Agreement and the Loan Documents as identified herein; and

Accordingly, the parties agree as follows:

1. **INCORPORATION BY REFERENCE:**

All definitions and terms used in the Agreement and the Loan Documents are hereby incorporated in this Amendment.

2. **AMENDMENT AND MODIFICATION TO THE AGREEMENT:**

A. In Section 2 (**LOAN; LOAN ADVANCES**), subsection (a) of the Schedule to the Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

(a) Seven Million Five Hundred Thousand and no/100 Dollars ($7,500,000.00) ("Maximum Amount"); or

B. In Section 4 (**FEES AND EXPENSES**), the subsection entitled **Minimum Loan Balance** is hereby deleted in its entirety and in lieu thereof the following is inserted:

**Minimum Loan Balance:** Commencing with the month of November of 2021 and continuing monthly thereafter, Borrower shall maintain an average outstanding principal balance of the Loan for each month in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) ("Minimum Loan Balance"). If the actual average outstanding principal balance of the Loan in any month is less than the Minimum Loan Amount, Borrower must pay interest for such month calculated on the Minimum Loan Balance.

C. In Section 4 (**FEES AND EXPENSES**), the subsection entitled Loan Fee is hereby deleted in its entirety and in lieu thereof the following is inserted:

**Loan Fee:** At closing of the Loan and on each one year anniversary of the date of the Agreement, Borrower will pay Crestmark a loan fee in the aggregate amount of one percent

The Borrower acknowledges and agrees that pursuant to the terms of the Agreement, the obligations of the Borrower and the Indebtedness are secured by a first priority lien and security interest in the Collateral (as defined in the Agreement). The Collateral is and shall remain subject to and encumbered by the lien, charge, and encumbrance of the Agreement, and nothing contained herein shall affect or be construed to affect the lien or encumbrance created by the Agreement or the priority thereof.

8. **NO ORAL MODIFICATION:**

This Amendment may only be altered or modified by written instrument duly executed by Borrower and Crestmark.

The parties hereto have executed this Amendment the day and year first appearing above.

**CRESTMARK, A DIVISION OF METABANK,**
National Association

By: ______________________
Name: Scott M Reisel
Its: Director

**BORROWER:**

**PRIMROSE CANDY CO.,**
an Illinois corporation

By: ______________________
Name: Jeffrey Puch
Its: President

By signing this Amendment, each undersigned Guarantor agrees it has read and understands the Agreement and agrees to all of its terms.

**CANDY MAE, INC.,**
an Illinois corporation

By: ______________________
Name: Jeffrey Puch
Its: President

**MAE PUCH, LTD.,**
an Illinois corporation

By: ______________________
Name: Jeffrey Puch
Its: President

**J & M PARTNERSHIP,**
an Illinois limited partnership

By: ______________________
Name: Jeffrey Puch
Its: Managing Partner

**AMENDMENT NO. 2**
**TO**
**LOAN AND SECURITY AGREEMENT**

This Amendment No. 2 to Loan and Security Agreement ("Amendment") is made this 18 day of September, 2024 (the "Effective Date"), by and between **PATHWARD, NATIONAL ASSOCIATION**, fka Crestmark, a division of MetaBank, National Association ("Pathward"), whose address is 5480 Corporate Drive, Suite 350, Troy, Michigan 48098, **PRIMROSE CANDY CO.,** an Illinois corporation ("Borrower"), whose address is 4111 W. Parker Ave., Chicago, Illinois 60639, **CANDY MAE, INC.,** an Illinois corporation ("Candy Mae") whose address is 4111 W. Parker Ave., Chicago, Illinois 60639, **J & M PARTNERSHIP,** an Illinois general partnership ("J&M") whose address is 4111 W. Parker Ave., Chicago, Illinois 60639, and **MAE PUCH, LTD.,** an Illinois corporation ("Mae", and together with Candy Mae and J&M, individually and collectively, the "Guarantor"), whose address is 4111 W. Parker Ave., Chicago, Illinois 60639. This Amendment amends that certain Loan and Security Agreement dated February 24, 2021 between Pathward and Borrower (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement").

**BACKGROUND:**

The parties have executed the Agreement and Loan Documents;

The Borrower and Guarantor are indebted and/or obligated to Pathward without offset or deduction pursuant to the Agreement and the Loan Documents all of which are in full force and effect; and

Borrower, Pathward, and Guarantor, desire to modify and amend certain terms, conditions, covenants and obligations contained in the Agreement and the Loan Documents, including, as set forth herein.

Accordingly, the parties agree as follows:

**1. <u>DEFINED TERMS</u>:**

Capitalized terms that are not otherwise defined in this Amendment shall have the meanings ascribed to them in the Agreement.

**2. <u>AMENDMENT AND MODIFICATION TO THE AGREEMENT</u>:**

A. All references to "Crestmark" in the Agreement and the other Loan Documents are hereby amended to "Pathward" and shall refer to Pathward, National Association, fka Crestmark, a division of MetaBank, National Association.

B. The language appearing in Section 2 of the Schedule to the Agreement, prior to the paragraph beginning with "**<u>Eligible Accounts</u>** means and includes those Accounts:...", is hereby deleted in its entirety and replaced with the following:

> "2. **<u>LOAN; LOAN ADVANCES.</u>**
>
> Advance Formula: Advances of the Loan may be measured against a percentage of Eligible Accounts, Eligible Inventory and Marketable Securities.

The Loan Amount may not exceed an amount which is the lesser of:

(a) Seven Million Five Hundred Thousand and 00/100 Dollars ($7,500,000.00) ("Maximum Amount"); or

(b) the sum of:

(i) Eighty-five percent (85%) of Eligible Accounts, PLUS

(ii) (y) as of the Effective Date of the Amendment No. 2 to Loan and Security Agreement by and between Pathward, Borrower and Guarantors, through and including July 31, 2025, the lesser of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) or fifty percent (50%) of Eligible Inventory, or (z) on and after August 1, 2025, the lesser of Two Million and 00/100 Dollars ($2,000,000.00), fifty percent (50%) of Eligible Inventory, or one hundred percent (100%) of (b)(i) above, PLUS

(iii) the lesser of One Million Five Hundred Thousand Dollars ($1,500,000.00) or eighty percent (80%) of the Marketable Securities pledged to Pathward and subject to a control agreement acceptable to Pathward in its sole discretion.

(subparagraphs (i) – (iii) are collectively the "Advance Formula").

Pathward in its sole discretion may raise or lower any percentage advance rate with respect to the Advance Formula."

C. Section 11.E. of the Schedule to the Agreement is hereby deleted in its entirety and replaced with the following:

"E. FINANCIAL COVENANTS:

Beginning on December 31, 2024 and continuing each quarter thereafter, Borrower will maintain a minimum Tangible Net Worth of at least equal to the Borrower's actual Tangible Net Worth as of September 30, 2024 less $750,000.00. This covenant is tested within 30 days of the end of each quarter. "Tangible Net Worth" means, as of the date of determination, total assets less total liabilities less the sum of (i) the aggregate amount of non-trade Accounts Receivable, including Accounts Receivable from affiliated or related Persons; (ii) prepaid expenses; (iii) deposits; (iv) net leasehold improvements; (v) goodwill; and (vi) any other asset which would be treated as an intangible asset under GAAP, plus Subordinated Debt. "Subordinated Debt" means any and all indebtedness presently or in the future incurred by Borrower to any creditor of Borrower entering into a written subordination agreement with Pathward.

In addition, at no time shall Borrower make any loans, advances, intercompany transfers or cash flow, between Borrower and any subsidiary, related entity or affiliate of Borrower or with any company that has common shareholders, officers or directors with Borrower.

All of the financial covenants in this Agreement shall be determined in accordance with GAAP, unless otherwise provided.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board that are applicable to the circumstances as of the date of determination and applied on a consistent basis."

3. **ADDITIONAL FINANCIAL REPORTS:**

In addition to the Financial Reports set forth in Section 13 of the Schedule to the Agreement, Borrower acknowledges and agrees to deliver to Pathward by November 30, 2024 (at Borrower's sole cost and expense) a phase-I environmental report and an appraisal on the real properties located at (a) 4111 W. Parker Avenue, Chicago, Illinois 60639 and (b) 4020-4042 W. Schubert, Chicago, Illinois 60639.

4. **REAFFIRMATION OF GUARANTY:**

As a specific inducement to Pathward to enter into the Agreement, each Guarantor has executed a separate Business Entity Guaranty dated February 24, 2021(individually and collectively, the "Guaranty"). Guarantor hereby acknowledges and agrees to the amendments and modification set forth above and reaffirms the Guaranty with respect to all liabilities, obligations and the Indebtedness therein guaranteed as herein amended and modified. Guarantor further acknowledges that Guarantor remains liable in accordance with the terms of the Guaranty without offset or counterclaim. Each Guarantor also acknowledges and agrees that Guarantor's liability under the Guaranty is unlimited. J&M also acknowledges and agrees that its Guaranty is secured by a first mortgage on the real property located at 4020-4042 W. Schubert, Chicago, Illinois 60639 and not affected in any way by any dollar amount set forth in the Mortgage, and if J&M receives any surplus out of a sale of such property in excess of the dollar amount of the Mortgage, Pathward is entitled to this surplus unless the Indebtedness has been paid in full, and in cash. Mae also acknowledges and agrees that its Guaranty is secured by a first mortgage on the real property located at 4111 W. Parker Avenue, Chicago, Illinois 60639 and not affected in any way by any dollar amount set forth in the Mortgage, and if Mae receives any surplus out of a sale of such property in excess of the dollar amount of the Mortgage, Pathward is entitled to this surplus unless the Indebtedness has been paid in full, and in cash.

5. **EXPENSES:**

In consideration of the extension of the loan and the execution of this Amendment, Borrower will pay Pathward a fee of $500.00, which fee is fully earned as of the date hereof, and non-refundable. Borrower will promptly pay all expenses, fees and costs incurred by Pathward with respect to the preparation, execution, and delivery of this Amendment, and all other documents contemplated herewith, including reasonable attorneys' fees.

## 6. DEFAULTS:

Pathward hereby waives the existing defaults of Section 11.E. of the Schedule to the Agreement relating to the Tangible Net Worth covenant for the quarterly reporting periods between March 2023 through and including June 2024 only. This waiver applies only to the aforementioned reporting period and all other periods will be subject to the reporting requirements stated in the Agreement.

Borrower acknowledges that the execution of this Amendment does not constitute a waiver or cure of any other Default, except as specifically set forth herein, whether matured or otherwise, if any, that previously existed or now exists under the Agreement or any Loan Document. By execution of this Amendment, Pathward will not be deemed to have waived any of its rights or remedies under the Agreement or any Loan Document.

## 7. SURVIVAL, REAFFIRMATION, AND NO DEFENSES:

Each undersigned Borrower and Guarantor agrees, in all capacities in which the signatory has executed the Agreement or any of the Loan Documents, as follows:

A. That, except as herein expressly modified or amended, all terms, conditions, covenants, representations and warranties contained in the Agreement and the Loan Documents are true and correct, continue to be satisfied in all respects and are legal, valid and binding obligations. The undersigned hereby ratify, agree to and confirm the Agreement and the Loan Documents and consent to and acknowledge this Amendment.

B. That payment of the Indebtedness is the valid obligation of Borrower and Guarantor and, as of the date hereof, Borrower and Guarantor have absolutely no defenses, claims, rights of set-off or counterclaims against Pathward or the payment of the Indebtedness. This Amendment shall not impair the rights, remedies and Collateral given in the Agreement and the Loan Documents.

C. That the liability of the undersigned howsoever arising or provided for in the Agreement and the Loan Documents is hereby reaffirmed.

## 8. RELEASE:

In consideration of Pathward executing this Amendment, Borrower and Guarantor do each hereby release and discharge Pathward of and from any and all claims, harm, causes of action, liabilities, injuries, expenses (including attorneys' fees) and damages of any and every kind, known or unknown, legal or equitable, which Borrower or Guarantor have against Pathward from the date of Borrower's and Guarantor's first contact with Pathward up to the date of this Amendment. Borrower and Guarantor confirm to Pathward that they have reviewed the effect of this release with legal counsel of their choice, or have been afforded the opportunity to do so, prior to the execution of this Amendment and each acknowledges and agrees that Pathward is relying upon this release in executing this Amendment.

## 9. CONFIRMATION OF LIEN UPON COLLATERAL:

The Borrower acknowledges and agrees that pursuant to the terms of the Agreement, the obligations of the Borrower and the Indebtedness are secured by a first priority lien and security interest in the Collateral (as defined in the Agreement). The Collateral is and shall remain subject to and encumbered by the lien, charge, and encumbrance of the Agreement, and nothing contained herein shall affect or be construed to affect the lien or encumbrance created by the Agreement or the priority thereof.

## 10. NO ORAL MODIFICATION:

This Amendment may only be altered or modified by written instrument duly executed by Borrower and Pathward.

## 11. COUNTERPARTS:

This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Amendment by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Agreement. Any Borrower or Guarantor delivering such an executed counterpart of the signature page to this Amendment by facsimile or electronic mail to any other party shall thereafter also promptly deliver a manually executed counterpart of this Amendment to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Amendment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE TO FOLLOW]

The parties hereto have executed this Amendment the day and year first appearing above.

"PATHWARD"

**PATHWARD, NATIONAL ASSOCIATION**

By: ______________________
Name: Scott M Kersch
Its: SVP

"BORROWER"

**PRIMROSE CANDY CO.,**
an Illinois corporation

By: ______________________
Name: Jeffrey Puch
Its: President

The undersigned Guarantor, by signing this Amendment, agrees it has read and understands this Amendment and agrees to all of its terms.

"GUARANTOR"

**CANDY MAE, INC.,**
an Illinois corporation

By: ______________________
Name: Jeffrey Puch
Its: President

**MAE PUCH, LTD.,**
an Illinois corporation

By: ______________________
Name: Jeffrey Puch
Its: President

**J & M PARTNERSHIP,**
an Illinois general partnership

By: ______________________
Name: Jeffrey Puch
Its: Managing Partner

[Signature page to Amendment No. 2 to Loan and Security Agreement]

# EXHIBIT C

AMENDMENT NO. 3
TO
LOAN AND SECURITY AGREEMENT

This Amendment No. 3 to Loan and Security Agreement ("Amendment") is made this 3 day of Dec, 2024, by and between **PATHWARD, NATIONAL ASSOCIATION**, fka Crestmark, a division of MetaBank, National Association ("Pathward"), whose address is 5480 Corporate Drive, Suite 350, Troy, Michigan 48098, **PRIMROSE CANDY CO.**, an Illinois corporation ("Borrower"), whose address is 4111 W. Parker Ave., Chicago, Illinois 60639, **CANDY MAE, INC.**, an Illinois corporation ("Candy Mae") whose address is 4111 W. Parker Ave., Chicago, Illinois 60639, **J & M PARTNERSHIP**, an Illinois general partnership ("J&M") whose address is 4111 W. Parker Ave., Chicago, Illinois 60639, and **MAE PUCH, LTD.**, an Illinois corporation ("Mae", and together with Candy Mae and J&M, individually and collectively, the "Guarantor"), whose address is 4111 W. Parker Ave., Chicago, Illinois 60639. This Amendment amends that certain Loan and Security Agreement dated February 24, 2021 between Pathward and Borrower (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement").

**BACKGROUND:**

The parties have executed the Agreement and Loan Documents;

The Borrower and Guarantor are indebted and/or obligated to Pathward without offset or deduction pursuant to the Agreement and the Loan Documents all of which are in full force and effect; and

Borrower, Pathward, and Guarantor, desire to modify and amend certain terms, conditions, covenants and obligations contained in the Agreement and the Loan Documents, including, as set forth herein.

Accordingly, the parties agree as follows:

**1. DEFINED TERMS:**

Capitalized terms that are not otherwise defined in this Amendment shall have the meanings ascribed to them in the Agreement.

**2. AMENDMENT AND MODIFICATION TO THE AGREEMENT:**

A. The language appearing in Section 2 of the Schedule to the Agreement, prior to the paragraph beginning with "**Eligible Accounts** means and includes those Accounts:...", is hereby deleted in its entirety and replaced with the following:

"2. **LOAN; LOAN ADVANCES.**

Advance Formula: Advances of the Loan may be measured against a percentage of Eligible Accounts, Eligible Inventory and Marketable Securities.

The Loan Amount may not exceed an amount which is the lesser of:

(a) Seven Million Five Hundred Thousand and 00/100 Dollars ($7,500,000.00) ("Maximum Amount"); or

(b) the sum of:

(i) Eighty-five percent (85%) of Eligible Accounts, PLUS

(ii) (y) On September 18, 2024 through and including July 31, 2025, the lesser of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) or fifty percent (50%) of Eligible Inventory, or (z) on and after August 1, 2025, the lesser of Two Million and 00/100 Dollars ($2,000,000.00), fifty percent (50%) of Eligible Inventory, or one hundred percent (100%) of (b)(i) above, PLUS

(iii) the lesser of Two Million Five Hundred Thousand Dollars ($2,500,000.00) or eighty percent (80%) of the Marketable Securities pledged to Pathward and subject to control agreements acceptable to Pathward in its sole discretion.

(subparagraphs (i) – (iii) are collectively the "Advance Formula").

Pathward in its sole discretion may raise or lower any percentage advance rate with respect to the Advance Formula.

"Marketable Securities" mean Investment Property that is (A) freely tradable on an established securities market without restriction, including any restrictions or limitations as to time or volume, but excluding, for the avoidance of doubt, securities of the Borrower or its successor and (B) held in (i) that certain securities account at BMO Harris in the name of Borrower identified as account number 000001459839, and (ii) that certain securities account at Mesirow Financial Investment Management, Inc. in the name of Borrower identified as account number WMT001549."

B. The subsection titled "Exit Fee" in Section 4 of the Schedule to the Agreement is hereby deleted in its entirety and replaced with the following:

"**Exit Fee:** Borrower may elect to prepay the Obligations but only upon the payment of all Obligations including the following exit fee ("Exit Fee"), as liquidated damages and not as a penalty: (i) prior to November 30, 2025, the Exit Fee will be two percent (2.00%) of the Maximum Amount plus any fees due or to become due under the Agreement, and (ii) on and after the November 30, 2025, the Exit Fee will be one percent (1.00%) of the Maximum Amount plus any fees due or to become due under the Agreement. No partial prepayment will affect the Borrower's obligation to continue the regular payments due under the Note.

The Exit Fee in the one percent (1.00%) of the Maximum Amount plus any fees due or to become due under the Agreement shall automatically renew on November 30, 2026 and each November 30th thereafter for one

additional year unless (i) Borrower notifies Pathward in writing within sixty (60) days before such anniversary date of Borrower's intention to terminate the Agreement and (ii) the Obligations are paid in full by such anniversary date. In the event that a Default has occurred and is continuing at the time Pathward demands payment of the Obligations, the Exit Fee will be due and payable by Borrower."

## 3. <u>REAFFIRMATION OF GUARANTY</u>:

As a specific inducement to Pathward to enter into the Agreement, each Guarantor has executed a separate Business Entity Guaranty dated February 24, 2021(individually and collectively, the "Guaranty"). Guarantor hereby acknowledges and agrees to the amendments and modification set forth above and reaffirms the Guaranty with respect to all liabilities, obligations and the Indebtedness therein guaranteed as herein amended and modified. Guarantor further acknowledges that Guarantor remains liable in accordance with the terms of the Guaranty without offset or counterclaim. Each Guarantor also acknowledges and agrees that Guarantor's liability under the Guaranty is unlimited. J&M also acknowledges and agrees that its Guaranty is secured by a first mortgage on the real property located at 4020-4042 W. Schubert, Chicago, Illinois 60639 and not affected in any way by any dollar amount set forth in the Mortgage, and if J&M receives any surplus out of a sale of such property in excess of the dollar amount of the Mortgage, Pathward is entitled to this surplus unless the Indebtedness has been paid in full, and in cash. Mae also acknowledges and agrees that its Guaranty is secured by a first mortgage on the real property located at 4111 W. Parker Avenue, Chicago, Illinois 60639 and not affected in any way by any dollar amount set forth in the Mortgage, and if Mae receives any surplus out of a sale of such property in excess of the dollar amount of the Mortgage, Pathward is entitled to this surplus unless the Indebtedness has been paid in full, and in cash.

## 4. <u>EXPENSES</u>:

In consideration of the extension of the loan and the execution of this Amendment, Borrower will pay Pathward a fee of $3,000.00, which fee is fully earned as of the date hereof, and non-refundable. Borrower will promptly pay all expenses, fees and costs incurred by Pathward with respect to the preparation, execution, and delivery of this Amendment, and all other documents contemplated herewith, including reasonable attorneys' fees.

## 5. <u>NO WAIVER</u>:

Borrower acknowledges that the execution of this Amendment does not constitute a waiver or cure of any other Default, whether matured or otherwise, if any, that previously existed or now exists under the Agreement or any Loan Document. By execution of this Amendment, Pathward will not be deemed to have waived any of its rights or remedies under the Agreement or any Loan Document.

## 6. <u>SURVIVAL, REAFFIRMATION, AND NO DEFENSES</u>:

Each undersigned Borrower and Guarantor agrees, in all capacities in which the signatory has executed the Agreement or any of the Loan Documents, as follows:

A. That, except as herein expressly modified or amended, all terms, conditions, covenants, representations and warranties contained in the Agreement and the Loan Documents are true and correct, continue to be satisfied in all respects and are legal, valid and binding obligations. The undersigned hereby ratify, agree to and confirm the Agreement and the Loan Documents and consent to and acknowledge this Amendment.

B. That payment of the Indebtedness is the valid obligation of Borrower and Guarantor and, as of the date hereof, Borrower and Guarantor have absolutely no defenses, claims, rights of set-off or counterclaims against Pathward or the payment of the Indebtedness. This Amendment shall not impair the rights, remedies and Collateral given in the Agreement and the Loan Documents.

C. That the liability of the undersigned howsoever arising or provided for in the Agreement and the Loan Documents is hereby reaffirmed.

**7. <u>RELEASE</u>:**

In consideration of Pathward executing this Amendment, Borrower and Guarantor do each hereby release and discharge Pathward of and from any and all claims, harm, causes of action, liabilities, injuries, expenses (including attorneys' fees) and damages of any and every kind, known or unknown, legal or equitable, which Borrower or Guarantor have against Pathward from the date of Borrower's and Guarantor's first contact with Pathward up to the date of this Amendment. Borrower and Guarantor confirm to Pathward that they have reviewed the effect of this release with legal counsel of their choice, or have been afforded the opportunity to do so, prior to the execution of this Amendment and each acknowledges and agrees that Pathward is relying upon this release in executing this Amendment.

**8. <u>CONFIRMATION OF LIEN UPON COLLATERAL</u>:**

The Borrower acknowledges and agrees that pursuant to the terms of the Agreement, the obligations of the Borrower and the Indebtedness are secured by a first priority lien and security interest in the Collateral (as defined in the Agreement). The Collateral is and shall remain subject to and encumbered by the lien, charge, and encumbrance of the Agreement, and nothing contained herein shall affect or be construed to affect the lien or encumbrance created by the Agreement or the priority thereof.

**9. <u>NO ORAL MODIFICATION</u>:**

This Amendment may only be altered or modified by written instrument duly executed by Borrower and Pathward.

**10. <u>COUNTERPARTS</u>:**

This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Amendment by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Agreement. Any Borrower or Guarantor delivering such an executed counterpart of the signature page to this Amendment by facsimile or electronic mail to any other party shall thereafter also promptly deliver a manually executed counterpart of this Amendment to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Amendment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE TO FOLLOW]

The parties hereto have executed this Amendment the day and year first appearing above.

"PATHWARD"

**PATHWARD, NATIONAL ASSOCIATION**

By: ____________________________
Name: ____________________________
Its: ____________________________

"BORROWER"

**PRIMROSE CANDY CO.,**
an Illinois corporation

By: ____________________________
Name: Jeffrey Puch
Its: President

The undersigned Guarantor, by signing this Amendment, agrees that it has read and understands this Amendment and agrees to all of its terms.

"GUARANTOR"

**CANDY MAE, INC.,**
an Illinois corporation

By: ____________________________
Name: Jeffrey Puch
Its: President

**MAE PUCH, LTD.,**
an Illinois corporation

By: ____________________________
Name: Jeffrey Puch
Its: President

**J & M PARTNERSHIP,**
an Illinois general partnership

By: ____________________________
Name: Jeffrey Puch
Its: Managing Partner

[Signature page to Amendment No. 3 to Loan and Security Agreement]

# EXHIBIT D

[redacted]

RECEIVED
IL SECRETARY OF STATE
UNIFORM COMMERCIAL CODE
02/24/21 15:21
$20.00 Electronic

**26996120** FS

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Patty Saliga 248-267-1601

B. E-MAIL CONTACT AT FILER (optional)
psaliga@crestmark.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Crestmark, a division of MetaBank
5480 Corporate Drive, Suite 350
Troy, MI, 48098

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC 1Ad)

1a. ORGANIZATION'S NAME: Primrose Candy Co.

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4111 West Parker Ave | Chicago | IL | 60639 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC 1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME: Crestmark, a division of MetaBank, National Association

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5480 Corporate Drive, Suite 350 | Troy | MI | 48098 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor whether now owned or hereafter acquired and wherever located.

NOTICE - PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN.

NOTWITHSTANDING DEBTOR'S AGREEMENT TO NOT FURTHER ENCUMBER THE COLLATERAL, IN THE EVENT THAT ANY ENTITY RECEIVES OR COLLECTS ANY OF THE COLLATERAL (INCLUDING BUT NOT LIMITED TO ACCOUNTS, INVENTORY, CHATTEL PAPER, GENERAL INTANGIBLES, INSTRUMENTS OR INVESTMENT PROPERTY) OR ITS PROCEEDS, SUCH ENTITY IS REQUIRED TO IMMEDIATELY DELIVER SUCH COLLATERAL AND ITS PROCEEDS TO SECURED PARTY, AND THE FAILURE TO DO SO MAY CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S RIGHTS AND REMEDIES WITH RESPECT TO THE COLLATERAL AND DEBTOR.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decendent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

# EXHIBIT E

pathward

| Borrowing Cert #: | 263 | Borrowers Name: | Primrose Candy Co. |
|---|---|---|---|

## Accounts Receivable

| | | | |
|---|---|---|---|
| BEGINNING UNPAID A/R Balance | 1/14/2026 | | $ 2,723,701.90 |
| Plus: Sales | | $ 154,834.00 | |
| Less: Credits Memos | | $ - | |
| Less: Collections | | $ 43,975.19 | |
| Less: Discounts | | | |
| Plus/(Minus): Adjustments | | | |
| ENDING UNPAID BALANCE of A/R | 1/19/2026 | | $ 2,834,560.71 |
| Less Ineligibles Accounts: | 11/30/2025 | | |
| >90 Day A/R - From Aging Dated: | | | $ 747,770.85 |
| Cross Aged Accounts (20%) | | | $ 377,746.54 |
| Foreign Accounts | | | $ - |
| Contra Accounts | | | $ - |
| Credits in Prior | | | $ - |
| Other - cash/credit card | | | $ - |
| Affiliate | | | $ - |
| Dilution Reserve 1.53% | | | $ 20,052.40 |
| TOTAL INELIGIBLES | | | $ 1,145,569.79 |
| NET UNPAID ACCOUNTS RECEIVABLE | | | $ 1,688,990.92 |
| Less: Margin Required | 15% | | $ 253,348.64 |
| AVAILABLE TO LOAN - ACCOUNTS RECEIVABLE | | | $ 1,435,642.28 |

## Finished Goods Inventory

| | | |
|---|---|---|
| TOTAL FINISHED GOODS INVENTORY as of | 1/19/2026 | $ 2,489,860.02 |
| Less Ineligibles as of: | 11/30/2025 | |
| Slow Moving & Expired Reserve | 259,003.00 | |
| Miscategorized RM Inventory as FG | - | |
| Miscategorized CS Inventory as FG | - | |
| xxx | - | |
| xxx | - | |
| ELIGIBLE FINISHED GOODS | | $ 2,230,857.02 |
| Less: Margin Required | 50% | $ 1,115,428.51 |
| NET AVAILABLE FINISHED GOODS | | $ 1,115,428.51 |
| Lesser of: | | |
| NET AVAILABLE INVENTORY, PER FORMULA | | $ 1,115,428.51 |
| A/R TO INVENTORY CAP** | 100% | $ 1,435,642.28 |
| INVENTORY CAP | | $ 2,000,000.00 |
| AVAILABLE TO LOAN - INVENTORY | | $ 1,115,428.51 |

## Marketable Securities

| | | |
|---|---|---|
| BMO Marketable Securities Total as of | 12/31/2025 | $ 2,302,278.00 |
| Mesirow Marketable Securities Total as of | 12/31/2025 | $ 1,499,962.08 |
| TOTAL MARKETABLE SECURITIES | | $ 3,802,240.08 |
| Less Ineligibles as of: | 12/31/2025 | |
| xxx | | |
| ELIGIBLE MARKETABLE SECURITIES | | $ 3,802,240.08 |
| Less: Margin Required | 20% | $ 760,448.02 |
| NET AVAILABLE MARKETABLE SECURITIES | | $ 3,041,792.06 |
| Lesser of: | | |
| NET AVAILABLE MKT SECURITIES, PER FORMULA | | $ 3,041,792.06 |
| MARKETABLE SECURITIES CAP | | $ 2,500,000.00 |
| AVAILABLE TO LOAN - MARKETABLE SECURITIES | | $ 2,500,000.00 |

## Availability Summary

| | |
|---|---|
| AVAILABLE TO LOAN | |
| Accounts Receivable | $ 1,435,642.28 |
| Inventory | $ 1,115,428.51 |
| Marketable Securities | $ 2,500,000.00 |
| Other - Tax Reserve | $ (44,198.00) |
| TOTAL AVAILABLE TO LOAN | $ 5,006,872.79 |
| NET LINE COMMITMENT | $ 7,500,000.00 |

## Loan Balance Summary

| | | |
|---|---|---|
| Beginning Loan Balance | | $ 4,977,340.01 |
| Less: A/R collection | | |
| Date: | 1/14/2026 | $ 41,192.97 |
| Date: | 1/15/2026 | $ 2,782.22 |
| Date: | | |
| Date: | | |
| Date: | | |
| Less:Non A/R collection/RETURN CHECK | | |
| NET LOAN BALANCE | | $ 4,933,364.82 |
| Plus: Advance Requested: | | |
| Advance Request | | $ 73,000.00 |
| Wire ($35) / ACH ($15) Fee | | $ 35.00 |
| Other Fees | | |
| Monthly Interest/Fees | | |
| * ENDING LOAN BALANCE* | | $ 5,006,399.82 |
| NET AVAILABILITY | | $ 472.97 |

Ending Loan Balance cannot exceed total available to loan or Net Line Commitment.

By delivering this Reconciliation Report,

Certified By: Michelle Puch
Title: CFO
Date: 1/21/2026

# EXHIBIT F

Primrose Candy Company

Weekly Cash Flows

| *Week ending* | Week 1 *Forecast* 2/6/2026 | Week 2 *Forecast* 2/13/2026 | Week 3 *Forecast* 2/20/2026 | Week 4 *Forecast* 2/27/2026 | *Weeks 1-4* TOTAL |
|---|---|---|---|---|---|
| **BEGINNING CASH BALANCE** | - | 8,288 | 44,513 | 137,575 | - |
| **OPERATING RECEIPTS** | | | | | |
| Customer Receipts | 204,275 | - | 111,243 | - | 315,518 |
| **Total Operating Receipts** | **204,275** | **-** | **111,243** | **-** | **315,518** |
| **OPERATING DISBURSEMENTS** | | | | | |
| Materials | (3,698) | (3,750) | (3,750) | (3,750) | (14,948) |
| Internal Labor | - | (110,000) | - | (110,000) | (220,000) |
| Contract Labor | (30,000) | (30,000) | (30,000) | (30,000) | (120,000) |
| Employee Benefits & Insurance | - | (45,000) | - | - | (45,000) |
| Utilities | - | (113,900) | - | - | (113,900) |
| Lease Costs | (9,746) | - | - | - | (9,746) |
| Insurance | (6,276) | - | - | - | (6,276) |
| Other operating | (17,135) | (17,375) | (17,375) | (17,375) | (69,260) |
| **Total Operating Disbursements** | **(66,856)** | **(320,025)** | **(51,125)** | **(161,125)** | **(599,131)** |
| **CASH FLOW FROM OPERATIONS** | **137,419** | **(320,025)** | **60,118** | **(161,125)** | **(283,613)** |
| **Financing/Other** | | | | | |
| Line of Credit Draw/ (Paydown) | (67,384) | 106,250 | 32,944 | 127,500 | 199,310 |
| Sale of Investments | - | 250,000 | - | - | 250,000 |
| Loan Fees & Interest | (61,747) | - | - | - | (61,747) |
| Bank Charges | - | - | - | - | - |
| UST Fees | - | - | - | - | - |
| Professional Fees | - | - | - | - | - |
| **Total Financing/Other, net** | **(129,131)** | **356,250** | **32,944** | **127,500** | **387,562** |
| **TOTAL CASH FLOWS** | **8,288** | **36,225** | **93,061** | **(33,625)** | **103,950** |
| **ENDING CASH BALANCE** | **8,288** | **44,513** | **137,575** | **103,950** | **103,950** |
| **ACCTS RECEIVABLE ROLLFORWARD** | | | | | |
| Beginning Balance | 2,479,664 | 2,400,389 | 2,525,389 | 2,564,146 | 2,479,664 |
| **Add: Sales** | **125,000** | **125,000** | **150,000** | **150,000** | **550,000** |
| Less: Receipts | (204,275) | - | (111,243) | - | (315,518) |
| Less: Adjustments | - | - | - | - | - |
| **Ending Balance** | **2,400,389** | **2,525,389** | **2,564,146** | **2,714,146** | **2,714,146** |
| **REVOLVING LOAN** | | | | | |
| **Collateral Value** | | | | | |
| Accounts Receivable | 1,190,331 | 1,296,581 | 1,329,524 | 1,457,024 | |
| Finished Goods Inventory | 1,115,429 | 1,115,429 | 1,115,429 | 1,115,429 | |
| Investments | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | |
| Tax Reserve | (44,198) | (44,198) | (44,198) | (44,198) | |
| **Total Collateral Value** | **4,761,561** | **4,867,811** | **4,900,755** | **5,028,255** | |
| **Loan Rollforward** | | | | | |
| Beginning Loan Balance | 4,828,945 | 4,761,561 | 4,867,811 | 4,900,755 | 4,828,945 |
| Less - Receipts | (204,275) | - | (111,243) | - | (315,518) |
| Less - Addtl Paydown | - | - | - | - | - |
| Add - Fees & Interest | 61,747 | - | - | - | 61,747 |
| Draw/ (Paydown) | 75,144 | 106,250 | 144,186 | 127,500 | 453,080 |
| **Ending Loan Balance** | **4,761,561** | **4,867,811** | **4,900,755** | **5,028,255** | **5,028,255** |
| **Excess Loan Availability** | - | - | - | - | |